In the Matter of the **APRIL 1956 TERM GRAND JURY.**

**Byron A. CAIN and Sally Cain et al.,**
Appellants,

v.

**UNITED STATES of America,**
Appellee.

**No. 11861.**

United States Court of Appeals
Seventh Circuit.

Nov. 13, 1956.

Rehearing Denied Dec. 10, 1956.

Writ of Certiorari Granted Feb. 25, 1957.

See (No. 9) 77 S.Ct. 552.

George B. Christensen, William T. Kirby, Chicago, Ill., for appellants.

Robert Tieken, U. S. Atty., Vincent P. Russo, Asst. U. S. Atty., Chicago, Ill., Charles A. McNelis, and James J. Sullivan, Sp. Attys., Department of Justice, Washington, D. C., and John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

On July 27, 1956, Byron A. Cain and Sally Cain, John H. Cain as Trustee of Cain Trust No. 1, a partnership, Harold E. Sullivan, Frank J. Huebner, Uptown Federal Savings & Loan Association of Chicago, Homan Mfg. Co., Inc., a corporation, and Cain & Culhane, Inc., a corporation, filed notice of appeal to this court from an order entered by the district court on July 18, 1956, dismissing their verified petition. The court's action was taken upon a motion of the United States of America, which filed no answer to the petition.

Allegations of pertinent facts set forth in said petition which, for the purpose of this proceeding, are accepted as true, are as briefly as possible now set forth.

In 1948 the treasury department began an investigation of Shotwell Manufacturing Company, a corporation (sometimes herein referred to as Shotwell)[1] and Byron A. Cain, Frank J. Huebner and Harold E. Sullivan, its officers. That investigation was being continued when the petition herein was filed. Shotwell furnished to treasury agents its records and suitable accommodations for the agents at its offices, and expended about $20,000 in making the services of its auditors available to said agents to assist the treasury's investigation, which extended also into the personal affairs of said Cain, Sullivan and Huebner.

Shotwell, Cain, Sullivan and Huebner were indicted on two counts on March 14, 1952, for allegedly wilfully and knowingly attempting to defeat and evade a large part of the income taxes due and owing by Shotwell to the United States of America for the calendar years 1945 and 1946, in violation of 26 U.S.C.A. § 145(b), in that defendants filed and caused to be filed false and fraudulent tax returns for said corporation. In a trial before a jury, defendants were convicted. On July 15, 1955, we reversed the judgment of conviction and remanded the case, United States v. Shotwell Manufacturing Company, 7 Cir., 225 F. 2d 394, with instructions to sustain a seasonably made motion by the defendants to suppress certain evidence, and to re-try the case.[2]

At the beginning of the year 1954 (after the trial of the criminal case), the treasury department commenced a new and complete audit and investigation of Shotwell's affairs and those of its officers for 1947 and subsequent years. Shotwell furnished space where its records were made available to the treasury agents.

On or about June 9, 1954, the then district director of internal revenue issued a departmental subpoena to Homan "In the Matter of the Tax Liability of Homan Mfg. Co. for the years 1944, 1945 and 1946", calling for all books, documents, work papers, etc., prepared and used at any date by: first, Frank Del-Monte, former cost accountant of Shotwell; second, Busby and Oury, certified public accountants working for Shotwell; and third, all persons and organizations, for Shotwell, in connection with sales by said company in said years.

About July 1, 1954, Shotwell (Homan) delivered to treasury agents books and records covering transactions during the

---

1. Now known as Homan Mfg. Co., Inc., a corporation, and hereinafter referred to as Homan or Shotwell.

2. Petition to the United States Supreme Court for *certiorari* is now pending.

1940's for examination, constituting a van load of papers, all of which were minutely examined by revenue agents, who made copies of those which they considered relevant, and which documents were returned to Shotwell in late 1955.[3]

Sundry records of Shotwell for the years 1947 to 1952 were called for by a subpoena issued by the acting district director about October 6, 1954. However, said records were not delivered by Shotwell because, among other reasons, Shotwell and its officers were advised and informed that said documents had been examined repeatedly by agents of the treasury and could no longer be called for re-examination under the internal revenue code,[4] constituted preparatory analyses of possible evidence to be adduced at the criminal trial and otherwise could not lawfully and constitutionally be subpoenaed.

In September and October 1955, other departmental subpoenas were served upon Homan and Byron A. Cain and Sally T. Cain, Cain Trust No. 1, and Cain & Culhane, Inc., calling for production of substantially all of their books, records and documents for the years 1947 to 1952 inclusive, relating to all of their transactions with or concerning the petitioners, or most of them.[5]

On September 15, 1955, the treasury department made a jeopardy assessment and levy against Homan for the years 1944, 1945 and 1946. The district court held the assessment and levy void. The government's appeal from that order is pending in this court.[6]

On September 16, 1955, Cain on behalf of himself, and Cain & Culhane, Inc., Homan, and Uptown Federal Savings and Loan Association of Chicago, wrote to the regional commissioner of the internal revenue service, declining to comply with the subpoenas, and stating his reasons therefor, including the statement that the materials referred to had been produced repeatedly for inspection by the government's examining agents. He averred that any further attempt to force production of such records would constitute unreasonable and unnecessary harassment and persecution, and therefore would constitute unreasonable searches and seizures in violation of the Fourth Amendment to the constitution of the United States as well as a denial of due process of law in violation of the Fifth Amendment to the constitution.

The treasury department has not attempted to enforce compliance with any of said subpoenas.

Prior to February 7, 1956, the treasury department recommended to the department of justice "that a grand jury investigation be undertaken to determine whether criminal proceedings should be initiated against one or more of [Cain & Culhane, Inc., Byron A. Cain and Sally T. Cain] for certain indicated violations of titles 18 and 26 U.S.C." The department of justice acceded and the attorney general appointed as special assistants Vincent P. Russo and Charles A. McNelis

---

3. However, the documents thus delivered by Shotwell did not include special compilations made out of the regular course of business by Frank DelMonte and Busby and Oury, as demanded by the June 9, 1954 subpoenas.

4. In their brief herein, petitioners cite 26 U.S.C.A. § 7605(b).

5. For example, Cain & Culhane, Inc. was directed to produce:

"All accounting books and records including general ledgers, journals, cash books, auxiliary registers and ledgers, together with canceled checks, vouchers, correspondence, invoices and other written data supporting the original entries in said accounting books relating to any and all transactions had with Byron A. Cain, Sally T. Cain, John H. Cain, James B. Cain, Mary A. Cain or Patricia A. Cain either directly or indirectly, including, but not limited to all books of account relative to reimbursement by Cain & Culhane, Inc. to Byron A. Cain for expenses of any nature, including payments made to Byron A. Cain, Sally T. Cain, John H. Cain, James P. Cain, Mary A. Cain or Patricia A. Cain and payments to others for or in behalf of Byron A. Cain, Sally T. Cain, John H. Cain, James B. Cain, Mary A. Cain, or Patricia A. Cain."

6. Homan Mfg. Co., Inc. v. D. J. Luippold, et al., No. 11782.

to conduct an investigation. Thereupon, at the behest of the treasury department and not *sua sponte*, the April 1956 term grand jury commenced an investigation into the income tax returns and allegedly related matters of several of the petitioners.

On April 10, 1956, Russo and McNelis caused a grand jury *subpoena duces tecum* to be issued directed to Leon J. Busby, an accountant who had done work for petitioners, requiring the production of documents, some of which had theretofore been by this court ordered suppressed in the criminal case. Thereupon Homan, Byron A. Cain, Harold E. Sullivan and Frank J. Huebner, by their complaint, asked the district court to quash said Busby subpoena, that Russo and McNelis be enjoined from using any of the material ordered suppressed before the grand jury, and also be enjoined from taking any witness before the grand jury for the purpose of testifying with respect to any part of said material. We affirmed an order of the district court dismissing the complaint. Homan Mfg. Co., Inc., v. Russo, 7 Cir., 233 F.2d 547.

About July 10, 1956, Russo and McNelis caused grand jury *subpoenas duces tecum* to be issued directed to John H. Cain, Trustee of Cain Trust No. 1, a partnership, Byron A. Cain, Harold E. Sullivan and Gladys Morrill, "as officers of Shotwell Mfg. Co.", Byron A. Cain as President of Cain & Culhane, Inc., Byron A. Cain as President of Uptown Federal Savings & Loan Association of Chicago, and Martin A. Culhane, as a partner of Cain & Culhane, Inc., a partnership existing during the years 1944 and 1945, returnable before the said grand jury on July 20, 1956. These subpoenas called for all records of said partnership and corporations in so far as they in any way touch or concern transactions with or for Byron A. Cain or any member of his family, including Sally T. Cain, John H. Cain, James B. Cain, Mary A. Cain or Patricia A. Cain; or with Harold E. Sullivan or any member of his family, including Stella M. Sullivan, Harold E. Sullivan, Jr., and Joseph Sullivan; and Frank J. Huebner, or any member of his family, including Lowell A. Huebner, Frank J. Huebner, Jr., Lorraine Huebner Mannebach, from 1944 through 1952.

Said documents would fill between two and three vans.

The July 10, 1956 grand jury subpoenas in large part duplicate and, in important particulars, are *in haec verba* with the treasury's administrative subpoenas of 1954 and 1955.

About July 13, 1956, Busby complied with the April 10, 1956 subpoena by delivery of sundry documents to the grand jury, which, acting under the advice of Russo and McNelis, thereupon turned the subpoenaed documents over to treasury agents for searching, and recessed for a week.

There are pending in the United States Tax Court eight cases involving an asserted tax liability of Shotwell from 1944 through 1952, and asserted liabilities of Byron A. Cain and Sally Cain and Cain & Culhane, Inc. for divers years, in which cases counsel for the treasury have repeatedly asserted that they are not ready for trial and require additional investigation and preparation.

Petitioners pray that "the grand jury minutes be produced in open court for examination in the premises; that the grand jury be assembled and be interrogated in the premises by the court; that the said assistant attorneys general be admonished or disciplined as to the court may seem meet; that all treasury agents who have received or in any way examined, outside the presence of a quorum of the grand jury duly assembled and in session, any of the documents surrendered under the Busby subpoena be punished for contempt".

The Department of Justice, both through the said Russo and McNelis and otherwise, has repeatedly announced that it is causing said grand jury to investigate as to whether crimes have been committed by petitioners Shotwell, Byron A. Cain, Harold E. Sullivan and Frank J.

Huebner. Hence petitioners further pray, that, if the court be satisfied that any of the documents surrendered to the grand jury under the said Busby subpoena have been seen or examined by any agents of the grand jury, the jury be instructed that it cannot validly consider any accusations of crime against the said named petitioners or make any inquiries as to them or return any indictments against them to which the said documents or any material in or suggested by them is or are in any way relevant.

They also pray that all of the subpoenas referred to be quashed "because the same constitute aggravated harassment of petitioners, are an unreasonable search and seizure, a violation of due process of law in violation of the several constitutional rights of the several petitioners". Petitioners further pray that the subpoenas be quashed "because they are but a step in an illegal scheme of the treasury to subvert the grand jury subpoena of this court into a tool for a treasury fishing expedition".

During oral argument in this case, Mr. Russo stated that, in July 1956, following the entry of the order from which the appeal herein was taken, the aforesaid *subpoenas duces tecum* directed to John H. Cain, et al. were obeyed and the records therein called for were turned over to the grand jury which caused the same to be examined as were the other records procured by prior subpoenas. That examination still continues.

Petitioners charge misuse of the powers of the grand jury. They contend that thereby their constitutional rights under the Fourth and Fifth Amendments of the Constitution of the United States are being and will be violated. The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, * * *."

The Fifth Amendment provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; * * * nor be deprived of * * * property, without due process of law; * * *."

They claim that, as a result of said violations, they will suffer injury in two areas; first, in the return of indictments against them and, secondly, in civil proceedings for the collection of federal taxes, with interest and penalties. We shall treat of these two areas separately.

■■ Inasmuch as this appeal pertains to an investigation of documents produced in accordance with grand jury subpoenas, the status of the grand jury in our jurisprudence is a polestar to guide us. The Fifth Amendment adopted the grand jury, as it existed at common law, and thereby made it a part of the fundamental law of the United States for the prosecution of crime. No part of the constitution defines the grand jury. No act of congress has ever attempted such a definition.[7] It had its origin in the common law and has existed for many hundred years.

■ The power of the grand jury is not dependent upon the court but is original and complete, and its duty is to diligently inquire into all offenses which shall come to its knowledge, whether from the court, the prosecutor, its own members or from any source, and it may make presentments of its own knowledge without any instruction or authority

7. While Rule 6 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., adopted under the authority of congress and relating to the grand jury, recognizes the continued existence of the grand jury system in this country, that rule is limited to providing a method for its organization, a manner of returning indictments or no bills, the period for which it serves, provision for relaxation of secrecy by the court, and, by enumeration, a restriction on the persons who may be present during the grand jury's sessions.

from the court. Cawley v. Warren, 7 Cir., 216 F.2d 74, 76.[8]

In Costello v. United States, 350 U.S. 359, at page 361, 76 S.Ct. 406, at page 408, the court said:

"The Fifth Amendment provides that federal prosecutions for capital or otherwise infamous crimes must be instituted by presentments or indictments of grand juries. But neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act. The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such information as they deemed satisfactory.

Despite its broad power to institute criminal proceedings the grand jury grew in popular favor with the years. It acquired an independence in England free from control by the Crown or judges. Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice. And in this country as in England of old the grand jury has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor."

■ While the grand jury is, in a sense, a part of our court system, when exercising its traditional functions it possesses an independence which is unique. Its authority is derived from none of the three basic divisions of our government, but rather directly from the people themselves. It is unnecessary for us to enunciate general rules as to when a grand jury may so exceed its historic authority as to justify a court in interfering with its investigatorial power. In the case at bar, we are asked to decide only whether the 1956 April term grand jury was acting within its authority in swearing witnesses and then entrusting them with subpoenaed records and documents for the purpose of exam-

8. In Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 786, 30 L.Ed. 849, 852, the court quoted with approval the language of Justice Field in a charge to a grand jury: " 'The institution of the grand jury * * * is of very ancient origin in the history of England,—it goes back many centuries. For a long period its powers were not clearly defined; and it would seem, from the accounts of commentators on the laws of that country, that it was at first a body which not only accused, but which also tried, public offenders. However this may have been in its origin, it was at the time of the settlement of this country an informing and accusing tribunal only, without whose previous action no person charged with a felony could, except in certain special cases, be put upon his trial. * * * the institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from the government, or be prompted by partisan passion or private enmity. No person shall be required, according to the fundamental law of the country, except in the cases mentioned, to answer for any of the higher crimes unless this body, consisting of not less than sixteen nor more than twenty-three good and lawful men, selected from the body of the district, shall declare upon careful deliberation, under the solemnity of an oath, that there is good reason for his accusation and trial.' "

ination thereof by or under the direction of said witnesses, out of the physical presence of the jury or any member thereof, for the purpose of assisting the grand jury in its deliberations.

■ While it is true that, at least in a limited sense, the testimony before a grand jury of witnesses who, pursuant to its direction, have examined voluminous records and documents and testify as to what they have found therein, is hearsay evidence, that fact would not make it improper for the grand jury to consider it.[9]

■ 1. In view of the independence of the grand jury and its traditional functions, on the showing made it would be incongruous for the district court to require the grand jury to produce its minutes in open court for examination, to assemble and interrogate it or the members thereof, to admonish or discipline the assistant attorneys general assigned to the grand jury, to instruct the jury that it cannot validly consider any accusations of crime against petitioners, make any inquiries as to them, return any indictments against them, to which the documents in question are relevant, or that the court should quash the grand jury subpoenas because, it is claimed, they are but a step in an illegal scheme to subvert the grand jury subpoena into a tool for a treasury fishing expedition. On the facts appearing in the petition alone, it would be unwarranted for the court to punish for contempt treasury agents merely because they have received or examined, outside the presence of a quorum of the grand jury assembled and in session, any of the documents surrendered to the grand jury in response to its subpoenas, and it would also be unwarranted for the court to quash all of the subpoenas on the ground of the constitutional violations charged. Any such actions by the district court would be gratuitous.

■ What we have just said should not be construed as precluding the right of the district court, to which indictments against the petitioners may be returned, from considering, if and when properly raised there, the contentions of the petitioners that their constitutional rights, herein relied on, were violated in the processes culminating in said indictments. Of course, we express no

---

**9.** In Costello v. United States, supra, 350 U.S. at page 362, 76 S.Ct. at page 408, the court said:

"* * * As late as 1927 an English historian could say that English grand juries were still free to act on their own knowledge if they pleased to do so. And in 1852 Mr. Justice Nelson on circuit could say 'No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof * * *.' United States v. Reed, 27 Fed.Cas.No.16,134, pp. 727, 738.

"* * * If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

"Petitioner urges that this court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquires unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial."

opinion as to how the district court should then rule. While we hold that the grand jury's actions under the circumstances are immune from interference by the court, we feel that any indictments which it votes, when they reach the court, carry no immunity from the application of the court's established criminal procedure.

2. In this country, as in England of old, the grand jury acts in secret. Costello v. United States, supra, 350 U.S. at page 362, 76 S.Ct. 406. Grand jury proceedings are traditionally secret. United States v. Rose, 3 Cir., 215 F.2d 617, 628. From earliest times it has been the policy of the law to shield the proceedings of grand juries from public scrutiny. Courts and text writers have advanced various reasons for this rule of secrecy. For a comprehensive review of this matter see Goodman v. United States, 9 Cir., 108 F.2d 516, 519, 127 A.L.R. 265 and the annotation at 272. See, also, Reichert v. Commissioner of Internal Revenue, 7 Cir., 214 F.2d 19, 22.[10]

The uncontradicted facts in this case in themselves point to an additional reason. The government had by various administrative subpoenas endeavored to gain access to the documents and records referred to in the petition. Having failed in that effort, government counsel made no effort to compel compliance with said subpoenas. Evidently they abandoned all civil procedures available to them. Instead they resorted to grand jury subpoenas and thereby brought those documents and records before the grand jury. With the consent of the grand jury this material has been turned over to treasury agents, who, with their assistants, have been examining it. If these efforts are directed toward the procuring of evidence for civil proceedings now or hereafter pending against petitioners, and that purpose is accomplished, then the secrecy of the grand jury has been breached. We find nothing in the history of the grand jury to justify the perversion of its functions or machinery by third persons for the purposes of a civil proceeding. The Fifth Amendment's adoption of the grand jury for use in the United States was for the historic purpose of initiating prosecutions for serious crimes. With the grand jury came its time-honored policy of secrecy. The idea that information obtained from the perusal of material in the possession of a grand jury may be used for the purpose of a civil proceeding is in direct conflict with the policy of secrecy of grand jury proceedings.

Moreover, the public has an interest in maintaining the secrecy of the grand jury. This is because the grand jury is the direct, independent representative of the people as a whole rather than those brought before it. The application of secrecy to its proceedings is a safeguard for the grand jury itself, because it tends to prevent it from being used as an instrument for explorations in aid of civil proceedings. Otherwise such misuse of the grand jury's time and functions

10. In the Reichert case, in speaking of a state statute dealing with grand juries, we quoted the reasons for secrecy as stated in Schmidt v. U. S., 6 Cir., 115 F. 2d 394, at page 396, by way of quotation from U. S. v. Amazon Industrial Chemical Corp., D.C., 55 F.2d 254, 261: " ' "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt. It is obvious that the basis of all but the last of these reasons for secrecy is protection of the grand jury itself, as the direct independent representative of the public as a whole, rather than of those brought before the grand jury." ' "

might in a substantial degree interfere with its investigation of crime and the return of indictments and no bills.

█ We are aware that it has been held that, if, after an indictment has been found and made public and the defendant has been apprehended, Metzler v. United States, 9 Cir., 64 F.2d 203, 206, and the grand jury discharged, Atwell v. United States, 4 Cir., 162 F. 97, 101, a disclosure becomes essential to the attainment of justice and the vindication of the truth, the rule of secrecy may be relaxed in the discretion of the court. This responsibility should reside in the court, of which the grand jury is a part and under the general instructions of which, it conducts its "judicial inquiry". Schmidt v. United States, 6 Cir., 115 F. 2d 394, 397. But, in the cases just cited, the purposes for relaxation of secrecy were fundamentally different from the government's purpose in searching for evidence, in the case before us. Therefore, in the situation presented to us in the case at bar, we hold that the safeguard of secrecy, in the interest of the public, continues even after the grand jury has completed its efforts and therefore forbids any use in civil proceedings of information derived by or through an examination of records and documents made under the authority of the grand jury.

It is significant that the government's counsel, in their brief herein, first, do not challenge the proposition that a grand jury subpoena cannot be used for the purpose of obtaining evidence to be used in a civil proceeding; and secondly, do not disclaim an intention to use, in civil proceedings, information gleaned from examination of the records and documents subpoenaed by the grand jury in this case.

We said in Homan Mfg. Co. v. Russo, 7 Cir., 233 F.2d 547, that the proceedings of the grand jury are secret but that we had no right to presume that the grand jury would permit records covered by its subpoenas to be diverted to the use of third persons, or that defendants propose or intend such diversion. We added that such a proposed use, if attempted, would invoke the protective power of the district court, which could act either contemporaneously or afterward in connection with such attempt. The admitted facts now before us show that there is a need for the exercise of the protective power of the district court.

█ 3. While we hold that the district court cannot properly interfere with the action of the grand jury in turning over to third persons, including treasury agents, voluminous records and accounts for the sole purpose of examination and report to the grand jury, as an assistance to it, we also hold that persons, nonmembers of the grand jury, thus having access to said records and documents, have no right to use them for any purpose whatsoever except to assist the grand jury in its work. Such persons may not in any manner use these records and documents, or any information acquired therefrom, for any other purpose, and specifically for any civil purpose, such as tax collection or otherwise. The right to freedom from interference by the court, which the grand jury enjoys, does not extend to such treasury agents or other third persons, including those who work with, under, or superior to said treasury agents. The direct or indirect use of any of the records and documents in question, or any information gained therefrom, in any civil proceeding can be prevented if objection is timely made therein. Moreover, the protective power of the district court should now be used to restrain any of such persons from in any manner violating the secrecy which enveloped these records and documents when the grand jury turned them over for examination. Such a restraining order should, of course, be in such detail and directed to such persons as to make it capable of effective enforcement. Thus, these are some of the ways in which the courts can and should implement the constitutional guarantees upon which the petitioners here rely. While, *in a criminal prosecution* based upon indictments of

these petitioners (if they are indicted) they will be required to await the return of said indictments before having a hearing in the trial court on their contentions that their constitutional rights were violated, we think it is now apparent that, as far as *civil proceedings* are concerned, the production of these records and documents pursuant to a grand jury subpoena, if followed by their use in any manner for the purposes of such a civil proceeding against petitioners, violates their constitutional rights under the hereinbefore quoted provisions of the Fourth and Fifth Amendments.

For the reasons herein set forth, the order from which this appeal was taken, is reversed and this cause is remanded to the district court for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded with directions.