524 F.2d 1109
 75-2 USTC P 16,203
 Leonard PATRICK, a Witness before the Special January 1974
Grand Jury, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee,
Leonard PATRICK, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
Jeanne EPSTEIN and Joseph Epstein, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 74-1780, 74-1884 and 74-1912.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 4, 1975.
Decided Oct. 24, 1975.
 
 Carl M. Walsh, Anna R. Lavin, Chicago, Ill., for petitioner-appellant.
 Scott P. Crampton, Asst. Atty. Gen., Dennis M. Donohue, Atty., Tax Div., Dept. of Justice, Washington, D. C., Samuel K. Skinner, U. S. Atty., Chicago, Ill., for respondent-appellee.
 Before McALLISTER, Senior Circuit Judge,* and SWYGERT and STEVENS, Circuit Judges.
 STEVENS, Circuit Judge.
 
 
 1
 In testimony given before a Grand Jury pursuant to a grant of immunity, appellant Patrick described a gambling business in which he held a 50% interest in 1967, 1968 and 1969. Based on that testimony the government made jeopardy assessments against Patrick and the Estate of his deceased partner, Epstein, of $835,558, for unpaid gambling taxes plus interest. In separate proceedings, Patrick and Epstein's Executors sought to enjoin the assessment and collection of the taxes, and Patrick sought the suppression of his Grand Jury testimony. The principal question presented by these three appeals is whether the district court properly held that relief was foreclosed by the statutory bar to such an injunction notwithstanding the allegations of misuse of the Grand Jury.
 
 
 2
 Patrick testified before the Grand Jury on February 6 and February 27, 1974. Excerpts from his testimony were placed in the record as an exhibit supporting the government's motion to dismiss Patrick's complaint. His testimony was given during the course of an investigation of gambling activities on Chicago's North Side. In his first appearance on February 6 he described certain practices and participants in that activity, and expressly acknowledged that he was a 50% owner of a "Sports Office" operated by Epstein which accepted wagers on sporting events; he identified an item of "Miscellaneous" income of $38,000 on his 1969 Federal Income Tax return as his share of the net income from the Sports Office during that year. He also acknowledged having had an interest in the business since 1955 or 1957, but denied participation after 1969.
 
 
 3
 In Patrick's second appearance on February 27, the prosecutor asked him a series of questions which arguably were intended to establish the amount of his wagering tax liability for 1967, 1968 and 1969. He first had Patrick reconfirm his testimony about the miscellaneous item on his 1969 income tax return, and then established that comparable entries, each for $28,000, on his 1967 and 1968 returns also reflected his share of the net income from the Sports Office in those years. The prosecutor then asked Patrick what amount of gross wagers would be required to produce those net profits. Patrick was unable to make even a rough estimate of the percentage of the gross that was represented by the net income figures, explaining that the day-to-day operation of the business had been Epstein's responsibility. Had Patrick given informative answers to these questions he would have provided a basis for determining the amount of his wagering tax liability since that tax is computed as 10% of the gambler's gross wagers. Other questions germane to the gambling investigation were also asked of Patrick during his appearance on the 27th as well as on the 6th.
 
 
 4
 As a result of his investigation the prosecutor concluded that Patrick had never filed any wagering tax returns for the money he received from the Sports Office, that he was liable for such taxes, and that since gamblers deal only in cash and maintain no records or bank accounts, a jeopardy assessment against Patrick would be appropriate.[1] Accordingly, on April 9, 1974, without notice to Patrick, he obtained an order from the district court authorizing the release of excerpts of Patrick's Grand Jury testimony and furnished those excerpts to the Internal Revenue Service.[2]
 
 
 5
 On April 18, 1974, the Acting District Director approved a jeopardy assessment against Patrick for wagering taxes in the amount of $835,558, including interest.[3] The assessment was based on an estimate of wagers accepted derived from Patrick's reported gambling income. This income, representing 50% of the Sports Office profits, was doubled to determine the total profit from the gambling business. This total profit was then divided by .03, the assumed rate of net profit on a gambling business, to determine the total amount of wagers accepted, which were subject to the 10% wagering tax. The 3% figure was obtained from an unofficial source a book entitled Scarne's Complete Guide to Gambling. The period covered by the assessment was January 1, 1967, through December 31, 1969, the period identified in the Grand Jury testimony. An assessment of $237 was made for the occupational tax, § 4411, for the same period.[4]
 
 
 6
 On December 13, 1974, the Internal Revenue Service amended its assessment for wagering tax to $125,328, based on a change in the estimated rate of net profit on the wagers accepted from 3 to 15%.
 
 Appeal No. 74-1884
 
 7
 On May 2, 1974, Patrick filed a complaint in district court "for the recovery of Internal Revenue taxes erroneously and illegally assessed and collected and to enjoin further actions by the Defendant, its officers, attorneys and employees from proceeding with collection under the purported authority of such assessments and to declare such assessments illegal and void, and the determination of jeopardy arbitrary and without basis in fact." The government filed a motion to dismiss supported by an affidavit and exhibits, including relevant excerpts from Patrick's Grand Jury testimony. On August 2, 1974, the district court dismissed the complaint on the ground the injunctive relief is barred by the Anti-Injunction Statute, 26 U.S.C. § 7421(a). Patrick has appealed from that order.
 
 Appeal No. 74-1780
 
 8
 On September 9, 1974, Patrick filed a motion in district court praying that the transcripts of his testimony be suppressed and their use in any proceeding or by any agency of the United States be prohibited. This motion was denied on September 12, 1974, on the ground that the issues raised were premature and would more properly be raised during the course of the tax refund litigation. Patrick has taken a separate appeal from that order.
 
 Appeal No. 74-1912
 
 9
 On May 15, 1974, the executors of Epstein's Estate filed a separate action seeking an injunction. Their attempt to avoid the bar of § 7421 rests on a different theory from Patrick's. They allege that the assessment against the estate is based entirely on Patrick's testimony about transactions between Patrick and Epstein before the latter's death, that Patrick is an "interested party" in this suit between the United States and the Estate, and that Patrick's testimony is therefore inadmissible under the Illinois Dead Man's Statute, Chap. 51, Paragraph 2, Ill.Rev.Stats. The district court dismissed Epstein's complaint on August 2, 1974, explaining that the dismissal was made for "substantially the same reason that plaintiffs' argument in Patrick was unavailing: the question of admissibility of evidence is not grounds for an exception to the anti-injunction provisions of 26 U.S.C. § 7421(a)". The Estate appeals from this dismissal.
 
 I.
 
 10
 By statute enacted in 1867, and effective continuously ever since, Congress has directed that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person."[5] In its recent opinion in Bob Jones University v. Simon, 416 U.S. 725, 736-745, 94 S.Ct. 2038, 2043, 40 L.Ed.2d 496, the Supreme Court reviewed the history of interpretation of the Anti-Injunction Statute and concluded that the stringent, almost literal, construction adopted in Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292, is viable today. Specifically, the Court held that irreparable injury to the taxpayer is not a sufficient basis for avoiding the statutory bar; instead of focusing on the degree of harm to the taxpayer, any exception to the statute must rest on a complete absence of merit in the government's position. The proposed tax assessment must be "plainly without a legal basis"; the case must be one in which the government has "no chance of success on the merits.[6]
 
 
 11
 The Court summarized and reaffirmed its unanimous holding in Williams packing:
 
 
 12
 Only upon proof of the presence of two factors could the literal terms of § 7421(a) be avoided: first, irreparable injury, the essential prerequisite for injunctive relief in any case; and second, certainty of success on the merits. (370 U.S.) at 6-7 (82 S.Ct. 1125 at 1128-1129). An injunction could issue only "if it is clear that under no circumstances could the Government ultimately prevail . . . ." Id., at 7 (82 S.Ct. 1125 at 1129). And this determination would be made on the basis of the information available to the Government at the time of the suit. "Only if it is then apparent that, under the most liberal view of the law and the facts, the United States cannot establish its claim, may the suit for an injunction be maintained."
 
 
 13
 416 U.S. at 737, 94 S.Ct. at 2046. In Williams Packing the Court had added:
 
 
 14
 To require more than good faith on the part of the Government would unduly interfere with a collateral objective of the Act protection of the collector from litigation pending a suit for refund.
 
 
 15
 370 U.S. 1, 7, 82 S.Ct. 1125, 1129. Thus, the statute only becomes inapplicable when the government should have known, at the time it made the assessment, that it had no chance of prevailing on the merits.
 
 
 16
 The several contentions advanced by appellants are insufficient to overcome this stringent reading of the statute. Since all three cases before us are in effect, actions to restrain the collection of a tax,[7] affirmance is required on all three appeals. We turn to appellant's specific arguments.
 
 II.
 
 17
 For different reasons, both Patrick and Epstein's Executors argue that the Grand Jury transcripts will not be admissible and that, without the transcripts, no evidence of tax liability exists.
 
 
 18
 Patrick argues that the transcripts were obtained illegally, and, therefore, by analogy to the exclusionary rule applicable to evidence obtained in violation of the Fourth Amendment they are inadmissible in a civil tax proceeding.[8] Three arguments are made to support the claim that the transcripts were obtained illegally: first, that the Internal Revenue Service should not have provided the U. S. Attorney with copies of Patrick's tax returns; second, that the questioning before the Grand Jury was intended to obtain evidence for use in a civil tax proceeding; and third, that the release of the Grand Jury transcripts to the District Director violated F.R.Crim.P. 6(e).
 
 
 19
 Epstein's Executors argue that the transcript is hearsay as to Epstein and that the Illinois Dead Man's Statute makes Patrick an incompetent witness against the decedent's estate.
 
 
 20
 None of these arguments has sufficient force to satisfy the Williams Packing standard of demonstrating that the government has no chance of prevailing.
 
 
 21
 This court has consistently refused to consider questions involving the admissibility of evidence in suits to restrain the collection of a tax. Koin v. Coyle, 402 F.2d 468 (7th Cir. 1968); Kennedy v. Coyle, 352 F.2d 867 (7th Cir. 1965); Zamaroni v. Philpott, 346 F.2d 365 (7th Cir. 1965). This is not a case in which we should deviate from that policy,[9] for plainly there is substance to the government's opposition to each of the objections to the admissibility of the transcripts.
 
 
 22
 The statutory prohibition against the disclosure of income tax returns[10] does not prevent their use by a prosecutor in aid of a Grand Jury investigation of criminal activities. Since this investigation dealt with the whole range of gambling activities on Chicago's North Side, in which Patrick was a participant, his tax returns could properly be used as a basis for questioning him.[11]
 
 
 23
 There is force to Patrick's argument that certain questions asked during his second appearance before the Grand Jury seem to have been directed at establishing his civil tax liability.[12] Even if that portion of the transcript should be excluded, however, the basis for the jeopardy assessment would remain. For Patrick's testimony about the miscellaneous item on his 1969 return, his acknowledgment of prior ownership of 50% of the Sports Office, and the existence of comparable miscellaneous items on his 1967 and 1968 returns, were all available prior to Patrick's second appearance before the Grand Jury and provided a reasonable basis for the conclusion that he was liable for unpaid wagering taxes for all three years. Thus, even if we accept Patrick's interpretation of the prosecutor's motivation during his second appearance, it would not necessarily follow that the entire transcript of his testimony should be suppressed.
 
 
 24
 A review of the excerpts of his testimony which are before us makes it clear that the Grand Jury was not convened, and that Patrick was not granted immunity, merely for the purpose of investigating his civil tax liability. Moreover, the fact that Patrick had been granted immunity from criminal prosecution does not avoid the government's argument that questioning about his business could reasonably be expected to shed light on the criminal activities of others in the same line of work in the same area. It is manifest that the government has some chance of success in persuading the trier of fact that the basis for the jeopardy assessment was disclosed during questioning of Patrick which was pertinent to the criminal investigation.
 
 
 25
 It is equally clear that the government has some chance of convincing the trial judge that the district court did not abuse its discretion when it authorized release of the Grand Jury transcript pursuant to Rule 6(e) of F.R.Crim.P.[13] Patrick argues that the rule does not authorize disclosure for use in aid of administrative proceedings. See In re Grand Jury Proceedings, 309 F.2d 440 (3rd Cir. 1962). The language of the rule, however, gives the district court power to permit disclosure "preliminarily to or in connection with a judicial proceeding." In this case the district court could reasonably anticipate that judicial proceedings would arise out of a contest over Patrick's failure to file any gambling tax returns when he admittedly had received such income.[14] We do not hold that it was proper to order release of the transcript without at least giving the taxpayer notice and an opportunity to object, but in view of the broad discretion conferred on the district court by Rule 6(e), the public purpose of the disclosure, and the stringent requirements of the William Packing test, there surely was not error so plain that an injunction against use of the transcript may be granted notwithstanding the mandate of § 7421(a).
 
 
 26
 Epstein's Executors' request for an injunction must be denied for a separate reason, even if we assume that the transcript of Patrick's testimony before the Grand Jury is not admissible against the Estate. As to the allegation that the transcripts are hearsay, the government could in good faith assume that Patrick will be available to repeat his testimony as a live witness in a civil trial. The government may legitimately contend that the immunity order will protect Patrick against the use of the same evidence repeated in another federal proceeding, and that the protection will apply to a state as well as a federal prosecution. Alternatively, the government may rely on the bar of limitations as an answer to any Fifth Amendment objection which might be raised by Patrick. Similarly, there is a serious question whether the Illinois Dead Man's Statute would be applicable in a federal refund suit,[15] and even if it should apply, Patrick's interest may not be sufficiently adverse to the Estate's to make him an interested person within the meaning of the Illinois statute.[16] We cannot say that the government will have "no chance" of obtaining sufficient testimony from Patrick to support the assessment against the Estate.
 
 
 27
 In sum, we decline to decide any of the evidentiary questions raised by the taxpayers in these injunction suits, finding sufficient substance in the government's arguments to meet the Williams Packing standard.
 
 III.
 
 28
 In addition to challenging the admissibility of his Grand Jury testimony, Patrick makes four attacks on the jeopardy assessment of $835,721: (1) that the use of testimony taken pursuant to a grant of immunity as a basis for a jeopardy assessment "offends the principles of due process"; (2) that an arbitrary and capricious method of computing the amount of the tax was used; (3) that the assessment is barred by the three-year statute of limitations; and (4) that there was a failure to comply with the statutory requirement that the Secretary's delegate must make a finding that the collection of the tax is in jeopardy.
 
 
 29
 There is no merit to the first argument. Patrick's Fifth Amendment privilege against being compelled to be a witness against himself in any criminal case does not afford him protection against giving testimony that will disclose his civil liability unless, of course, that testimony may subject him to criminal prosecution. The grant of immunity removed his only legitimate objection to giving the government an honest and complete statement, even if compelled, of the facts which may give rise to gambling tax liability. Unlike a forfeiture or the imposition of a fine, the jeopardy assessment is merely a method of enforcing a civil obligation, rather than a form of punishment. Cf. United States v. Coin & Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434.
 
 
 30
 The second argument, which questions the manner of calculating the tax due, is supported by the holding in Pizzarello v. United States, 408 F.2d 579 (2d Cir. 1969), and by the fact that, after conference with counsel for the taxpayers, the government voluntarily reduced the assessment from $835,721 to $125,328.[17] The facts before us, however, are not so extreme as those in Pizzarello, where collections during a three-day period were extrapolated to cover a period in excess of five years. Here, the amount of profit from the gambling business was based on Patrick's own testimony and tax returns; the computation of the gross receipts required to produce that profit was based on a factor found in a published text, the reliability of which the government had no reason to doubt. Under the Williams Packing formulation, these facts do not enable us to question the agents' good faith even though they subsequently were persuaded that the gambling business had been much more profitable (and therefore that the gross receipts were much smaller) than they originally believed.
 
 
 31
 Patrick's contention that the tax is barred by the three-year statute of limitations[18] is met by the government's response that since no return was filed, the statute has not run. This response is supported both by a specific statute[19] and by an en banc decision of the Fifth Circuit, Lucia v. United States, 474 F.2d 565 (1973). It therefore cannot be said that the government has no chance of prevailing on this issue.
 
 
 32
 We also reject Patrick's contention that there was a failure to comply with statutory requirements that the Secretary's delegate (in this case the District Director) "believes that the collection of . . . tax . . . will be jeopardized by delay" and make "a finding that the collection of such tax is in jeopardy."[20] Patrick's argument does not rest on the ground that the finding was not formally made by the Acting District Director, but rather that the finding was made on the basis of the covering letter from the Assistant United States Attorney and on the basis of a section of the I.R.S. manual, rather than an independent investigation of the facts by the Acting District Director. By hypothesis, jeopardy assessments are appropriate in cases in which expedited procedures may be required. It therefore is not frivolous for the government to contend that in such cases the Director may rely on reasonable presumptions and on information supplied by another branch of government. In any event, in this area the law is somewhat unclear; we therefore cannot say that the government was not acting in good faith when it made the jeopardy assessment.[21]
 
 IV.
 
 33
 Patrick also argues that forcing him to resort to a refund suit to challenge the amount of the jeopardy assessment, in whole or in part, will put an impermissible burden on his Fifth Amendment privilege against self-incrimination.[22] Since he must assume the burden of proof in a refund suit, he must necessarily present evidence which will be incriminating or else forego his claim for the return of his money. As a practical matter, the jeopardy assessment against a gambler is therefore, according to Patrick's argument, a form of compulsion forbidden by the Fifth Amendment.
 
 
 34
 Arguably, the practical compulsion involved in this jeopardy assessment is not constitutionally distinguishable from any other civil burden imposed by the government on a citizen which is presumptively valid and which can only be rebutted by a disclosure of criminal conduct. Persons who derive income from unlawful activities are not immune from tax liability;[23] they voluntarily assume some risk that they may not be in a position to participate in civil litigation, including tax refund litigation, as effectively as law-abiding citizens because evidence of criminal conduct may be critical to a fair presentation of their side of the controversy.
 
 
 35
 Assuming, however, that the jeopardy assessment against Patrick will compel him to testify against himself in a subsequent refund case, we are nevertheless satisfied that no violation of his Fifth Amendment privilege will result. For on the hypothesis that the evidence he presents in a refund suit is testimony which he has been compelled to give against himself within the meaning of the Fifth Amendment, it would follow that he will be entitled to an implied immunity against the use of such testimony in any federal criminal proceeding. Cf. Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562.
 
 
 36
 Furthermore, on the facts alleged by Patrick, such later testimony would be elicited only because the government could use the grand jury testimony as a basis for the assessment. Thus, any testimony elicited in the tax proceeding would be "information . . . indirectly derived from . . . testimony" compelled under the original immunity grant and thus could not be used against Patrick in any criminal proceeding. Kastigar v. United States, 406 U.S. 441, 449, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Such derivative use immunity, of course, would also prevent state prosecuting authorities from using the testimony. Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).
 
 
 37
 Finally, Patrick contends that the use of his immunized testimony against him in a civil case shows that the immunity granted under 18 U.S.C. §§ 6002 and 6003 is not as broad as the privilege it supplants. The Fifth Amendment provides that no person shall be compelled to be a witness against himself in a criminal case. A witness has no Fifth Amendment privilege against giving testimony detrimental to his interests in a civil case unless such testimony tends to incriminate him; if the risk of criminal consequences is removed by a grant of immunity, no Fifth Amendment objection remains. United States v. Cappetto, 502 F.2d 1351 (7th Cir. 1974). See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).
 
 
 38
 Since plaintiffs have not been able to show that the government cannot possibly prevail, these actions are barred by the Anti-Injunction Statute and were correctly dismissed.
 
 
 39
 Affirmed.
 
 
 
 *
 Senior Circuit Judge Thomas F. McAllister of the United States Court of Appeals for the Sixth Circuit is sitting by designation
 
 
 [1]
 These conclusions are summarized in the covering letter from the U. S. Attorney's Office to the Internal Revenue Service enclosing excerpts from the Grand Jury testimony released by order of the district court. That letter included the following paragraph:
 As a result of my investigation I believe that Patrick has never filed any wagering tax returns for the money he received from his gambling business. As you know gamblers deal only in cash, and keep no records or any bank accounts. Usually they maintain some tangible assets, but of such a nature that can be quickly liquidated. I suggest the Internal Revenue Service take immediate steps to effect the collection of unpaid gambling taxes, because if normal procedures are followed any tangible assets will be quickly dissipated, and the collection of the taxes jeopardized.
 
 
 [2]
 The government's motion for that order authorizing release of excerpts from the transcripts of Patrick's Grand Jury testimony and delivery of those excerpts to the Internal Revenue Service expressly stated that the purpose of such release was to determine "(1) whether there have been criminal violations of Title 26, United States Code; and (2) whether there are additional civil tax liabilities due and owing to the United States."
 
 
 [3]
 The recommendation for jeopardy assessment submitted to the acting District Director for approval gave the following reasons for a jeopardy assessment:
 "Mr. Epstein and Mr. Patrick have shown noncompliance in regard to filing Federal Excise Tax Forms 730 and Forms 11-c. Mr. Patrick's testimony establishes the fact that they were engaged in the business of accepting wagers; therefore, the respective returns should have been filed.
 "Internal Revenue Manual Section 4584.5 is applicable and establishes a prima facie jeopardy case. Failure to take immediate action to levy and seize Mr. Patrick's and Mr. Epstein's assets may preclude future collection of the tax."
 
 
 [4]
 An excise tax in the amount of 10% of the wagers accepted is imposed by 26 U.S.C. § 4401. A special tax of $50 per year to be paid by each person who is liable for tax under § 4401 is imposed by 26 U.S.C. § 4411. Notice of the jeopardy assessments ($835,721 wagering tax and $237 occupational tax) and levy for that amount were sent to Patrick on April 19, 1974. Notice of Jeopardy Assessment was sent to Epstein's Executors the same day. The assets of the estate were then subject to immediate levy, but an agreement was made between counsel for the estate and counsel for the government on May 22, 1974, that no disbursements would be made from the estate and the government would not file a notice of levy during the pendency of the case
 
 
 [5]
 26 U.S.C. § 7421(a). See Bob Jones University v. Simon, 416 U.S. 725, 731-732, 94 S.Ct. 2038, 2043, 40 L.Ed.2d 496 n. 6
 
 
 [6]
 See Bob Jones University v. Simon, 416 U.S. at 745, 94 S.Ct. at 2050
 The "no chance of success on the merits" language is the Court's characterization of the holding in Miller v. Nut Margarine Co., 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422, rather than a restatement of the test for application of the exception; nevertheless, it fairly reflects the Court's reading of the act.
 
 
 [7]
 Appeal No. 74-1780 is from an order refusing to suppress the Grand Jury transcript, but the purpose of the underlying action is to frustrate the government's attempt to collect the tax. The Anti-Injunction Act is therefore applicable. Koin v. Coyle, 402 F.2d 468 (7th Cir. 1968)
 
 
 [8]
 In order to shorten this opinion, we assume arguendo that the transcripts would be inadmissible if they were obtained illegally, but there is, of course, no certainty that the exclusionary rule would be extended to a situation of this kind. Cf. Calandra v. United States, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561. That lack of certainty might itself, under the Williams Packing standard, be a sufficient basis for rejecting the taxpayer's claim for injunctive relief
 
 
 [9]
 Plaintiff has asked us to reconsider our holdings in Zamaroni in light of the holdings of the Second Circuit in Pizzarello v. United States, 408 F.2d 579 (1969), and of the Fifth Circuit in Lucia v. United States, 474 F.2d 565 (en banc) (1973)
 This case, however, is unlike Lucia and Pizzarello. Those cases involved violations of the Fourth Amendment, violations which were well known to result in exclusion. In fact, in each case, the evidence involved had already been ordered suppressed in prior criminal or quasi-criminal actions. Here, Patrick's contentions are essentially directed to misconduct based on an improper intent on the part of the government. It would require an evidentiary hearing to establish such an intent.
 
 
 [10]
 26 U.S.C. § 7213(a)
 § 7213. Unauthorized disclosure of information
 (a) Income returns.
 (1) Federal employees and other persons It shall be unlawful for any officer or employee of the United States to divulge or to make known in any manner whatever not provided by law to any person the amount or source of income, profits, losses, expenditures, or any particular thereof, set forth or disclosed in any income return, or to permit any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; and it shall be unlawful for any person to print or publish in any manner whatever not provided by law any income return, or any part thereof or source of income, profits, losses, or expenditures appearing in any income return; and any person committing an offense against the foregoing provision shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution; and if the offender be an officer or employee of the United States he shall be dismissed from office or discharged from employment."
 
 
 [11]
 Treasury Regulation 26 C.F.R. § 301.6103(a)-1(h) provides:
 "(h) Use of returns in grand jury proceedings and in litigation. Returns made in respect of any tax described in paragraph (a)(2) of this section, or copies thereof, may be furnished by the Secretary or the Commissioner or the delegate of either to a U.S. attorney or an attorney of the Department of Justice for official use in proceedings before a U.S. grand jury, or in litigation in any court, if the United States is interested in the result, or for use in preparation for such proceedings or litigation. * * *
 If a return, or copy thereof, is furnished pursuant to this paragraph, it shall be limited in use to the purpose for which it is furnished and is under no condition to be made public except to the extent that publicity necessarily results from such use. * * * "
 This regulation was upheld in Laughlin v. United States, 154 U.S.App.D.C. 196, 474 F.2d 444 (1972), at least where the government was not using the grand jury for the purpose of gathering evidence for use in a civil tax case.
 
 
 [12]
 Patrick is correct in objecting to such questioning as an abuse of the Grand Jury. See United States v. Proctor & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077, and In the Matter of the April 1956 Term Grand Jury, 239 F.2d 263 (7th Cir. 1956). In the latter case, we said:
 "With the consent of the grand jury this material (documents and records obtained by grand jury subpoena after administrative subpoenas had been unsuccessful) has been turned over to treasury agents, who, with their assistants, have been examining it. If these efforts are directed toward the procuring of evidence for civil proceedings now or hereafter pending against petitioners, and that purpose is accomplished, then the secrecy of the grand jury has been breached. We find nothing in the history of the grand jury to justify the perversion of its functions or machinery by third persons for the purposes of a civil proceeding. The Fifth Amendment's adoption of the grand jury for use in the United States was for the historic purpose of initiating prosecutions for serious crimes. With the grand jury came its time-honored policy of secrecy. The idea that information obtained from the perusal of material in the possession of a grand jury may be used for the purpose of a civil proceeding is in direct conflict with the policy of secrecy of grand jury proceedings." 239 F.2d at 271.
 
 
 [13]
 Federal Rule of Criminal Procedure 6(e), Title 18, U.S.C
 "(e) Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule. The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons."
 
 
 [14]
 Cf. Special February 1971 Grand Jury v. Conlisk, 490 F.2d 894, 896-897 (7th Cir. 1973)
 
 
 [15]
 As to the applicability of the Dead Man's Statute in a case based on federal law, see the excellent summary of case law in Courtland v. Walston & Co., Inc., 340 F.Supp. 1076, 1087-1092 (S.D.N.Y.1972)
 Furthermore, it should be noted that the question would have to be decided in light of Federal Rule of Evidence 601, Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1934, 28 U.S.C. effective July 1, 1975:
 "Rule 601. General Rule of Competency
 "Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law."
 
 
 [16]
 Ch. 51, § 2, Ill.Rev.Stat
 " § 2. Parties and interested persons Incompetency Exceptions
 In the trial of any civil action in which any party sues or defends as the representative of a deceased or incompetent person, no adverse party or person directly interested in the action shall be allowed to testify on his own behalf to any conversation with the deceased or incompetent person or to any event which took place in the presence of the deceased or incompetent person, except in the following instances:
 "(1) If any person testifies on behalf of the representative to any conversation with the deceased or incompetent person or to any event which took place in the presence of the deceased or incompetent person, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event.
 (2) If the deposition of the deceased or incompetent person is admitted in evidence on behalf of the representative, any adverse party or interested person, if otherwise competent, may testify concerning the same matters admitted in evidence.
 (3) Any testimony competent under Section 3 of this Act, is not barred by this Section.
 (4) No person shall be barred from testifying as to any fact relating to the heirship of a decedent.
 As used in this section:
 (a) 'Incompetent person' means any person who is adjudged by the court in the pending civil action to be unable to testify by reason of mental illness, mental retardation or deterioration of mentality.
 (b) 'Representative' means an executor, administrator, heir, legatee or devisee of a deceased person and any guardian, or trustee of any such heir, legatee or devisee or a guardian or conservator of, or guardian ad litem for, an incompetent person.
 (c) 'Person directly interested in the action' or 'interested person' does not include a person who is interested solely as executor, trustee or in any other fiduciary capacity, whether or not he receives or expects to receive compensation for acting in that capacity.
 (d) This amendatory Act of 1973 applies to proceedings filed on or after its effective date.
 Amended by P.A. 78-522, § 1, eff. Oct. 1, 1973.
 
 
 [17]
 This information was presented to the court in a "Motion to Consider Intervening Circumstances" filed by plaintiffs. We ordered that the motion be taken under advisement with the case. The motion is granted and the change in the amount of the assessment has been considered
 
 
 [18]
 26 U.S.C. § 6501(a)
 § 6501. Limitations on assessment and collection
 (a) General rule Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.
 
 
 [19]
 26 U.S.C. § 6501(c)(3)
 "(3) No return. In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time."
 
 
 [20]
 26 U.S.C. § 6862 allows an immediate assessment if the Secretary or his delegate believes that the collection of any tax (other than income tax, estate tax, and gift tax) under any provision of the internal revenue laws will be jeopardized by delay
 26 U.S.C. § 6331 provides (in relevant part):
 "If the Secretary or his delegate makes a finding that the collection of such tax is in jeopardy, notice and demand for immediate payment of such tax may be made by the Secretary or his delegate and, upon failure or refusal to pay such tax, collection thereof by levy shall be lawful without regard to the 10-day period provided in this section."
 
 
 [21]
 The case most in favor of Patrick's position is United States v. Bonaguro, 294 F.Supp. 750 (E.D.N.Y.1968). That case is distinguishable, however, since there the I.R.S. made the jeopardy assessment on facts which it demonstrably knew were not true
 
 
 [22]
 Epstein, who died in 1972, cannot, of course, incriminate himself
 
 
 [23]
 See, e. g., United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037; United States v. Oliver, 505 F.2d 301 (7th Cir. 1974)