**In re CORRUGATED CONTAINER ANTITRUST LITIGATION.**

**Appeal of John CONBOY, Deponent.**

**No. 81–1960.**

United States Court of Appeals, Seventh Circuit.

Argued July 15, 1981.

Decided July 17, 1981.

Kevin M. Flynn, Coffield, Ungareiti, Harris & Slavin, Chicago, Ill., for appellant.

Francis J. McConnell, McConnell & Campbell, Chicago, Ill., for appellee.

Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SWYGERT, Senior Circuit Judge.

This is an appeal from an order holding a non-party deponent in civil contempt for asserting the Fifth Amendment in response to questions read verbatim from or closely tracking transcripts of the deponent's previously immunized testimony. The district court ordered the deponent to answer the questions apparently on the ground that he would not be subject to future criminal prosecution based on this testimony. For the reasons stated herein, we affirm the order of the district court.

I

Appellant John A. Conboy is a former employee of Weyerhaeuser Company, one of the defendants in this civil antitrust action instituted by plaintiffs, purchasers of corrugated containers who elected to opt out of the class action brought by other purchasers. In January, 1978, Conboy received a letter from the Department of Justice asking him to appear for an interview in connection with a criminal investigation of alleged price fixing in the corrugated container industry. The letter stated that:

the information which you reveal in the course of the interview and the transcript derived therefrom, along with the personal documents which you deliver to us, will be given the same treatment and protections afforded statements made before a grand jury pursuant to a court order compelling testimony and granting immunity.

On January 10, 1978, Conboy submitted to the interview, in which he answered questions concerning his participation in and knowledge of the alleged price fixing.

By court order on January 16, 1978, Conboy was granted use immunity for his testimony before the grand jury pursuant to 18 U.S.C. § 6001 et seq. Conboy then testified before the grand jury, restating the infor-

mation he had provided in the interview and expanding on his knowledge of alleged communications and agreements regarding prices. Several defendants were indicted as a result of the grand jury investigation.

Following the criminal trial, numerous civil antitrust actions were filed in various district courts. These lawsuits were consolidated by the Judicial Panel on Multi-District Litigation and assigned to Chief Judge John V. Singleton, Jr. of the Southern District of Texas.[1] The class action plaintiffs have either tried or settled their claims against these defendants, but the cases of eighteen opt-out plaintiffs are still pending.

Pursuant to a subpoena issued by the United States District Court for the Northern District of Illinois, Conboy appeared with counsel for a deposition on May 20, 1981. Counsel for the opt-out plaintiffs asked Conboy questions either taken verbatim from or closely tracking the transcripts of his grand jury testimony and Justice Department interview. Conboy, on advice of counsel, asserted his Fifth Amendment privilege in response to the questions.

 Counsel for plaintiffs then telephoned Judge Singleton and moved him to compel Conboy to answer the questions. After hearing arguments of counsel for

both sides and questioning Conboy, the judge, expressly invoking his authority to exercise the powers of the District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1407(b), ordered Conboy to answer the questions. When Conboy continued to assert his Fifth Amendment privilege, the judge held him in contempt of court but stayed the operation of the order pending this appeal.[2]

## II

 The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This privilege "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). The Fifth Amendment privilege may be invoked, however, only when " 'the claimant is confronted by substantial and "real," and not merely trifling or imaginary, hazards of incrimination.' " *United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980) (quoting *Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968)). The privilege may be supplant-

---

1. Judge Singleton previously presided over the federal grand jury investigation of the corrugated container industry, the subsequent criminal trial of corrugated container manufacturers for price fixing, and the class action instituted by corrugated container purchasers.

2. Both Conboy and the opt-out plaintiffs contend that this court has jurisdiction over the appeal after the Fifth Circuit's decision in *In re Corrugated Container Antitrust Litigation, Appeal of Franey*, 620 F.2d 1086 (5th Cir. 1980). Rule 45(d)(2) of the Federal Rules of Civil Procedure provides that a deponent can be required to appear at a deposition only in the county in which he resides or is employed or transacts business. As a non-party witness, Conboy was not subject to the jurisdiction of the district court for the Southern District of Texas. *See Franey, supra*, 620 F.2d at 1090 & n.3. Rule 37(a)(1) provides: "An application of an order to a deponent who is not a party shall be made to the court in the district where the deposition is being taken." The Fifth Circuit interpreted that provision to mean that only the court sitting in the district where the deposition was being taken has the power to compel testi-

mony and enter a contempt order against the deponent. Because Judge Singleton, in *Franey* as well as the case at bar, was exercising the powers of a district judge in the district where the deposition was being taken pursuant to 28 U.S.C. § 1407(b), then according to the Fifth Circuit, the appeal must be taken in "the court of appeals for the circuit embracing the district" in which the contempt order was entered. 28 U.S.C. § 1294.

As the Second Circuit has noted, however, because section 1407 consolidates multi-district cases to achieve greater efficiency, "it is arguable that its purposes would be best served by permitting appeals to only one circuit." *In re Corrugated Container Antitrust Litigation, Appeal of Fleischacker*, 644 F.2d 70, 74 n.6 (2d Cir. 1981). Nevertheless, we agree with the parties that under 28 U.S.C. § 1294 we have jurisdiction over this appeal from a contempt order entered by a district judge exercising the power of a district judge in the Northern District of Illinois. *See Fleischacker, supra*, 644 F.2d at 74 n.6.

ed, and a witness ordered to testify, by a grant of immunity that is co-extensive with the privilege because "the grant of immunity has removed the dangers against which the privilege protects." *Kastigar, supra,* 406 U.S. at 449, 92 S.Ct. at 1658.

█ In the case at bar, Conboy was granted use immunity pursuant to 18 U.S.C. § 6002[3] for his testimony before the grand jury. The terms of the immunity statute prohibit the use of the immunized testimony or any information "directly or indirectly derived from" it in any criminal case except a perjury prosecution. *Id. See also Kastigar v. United States, supra,* 406 U.S. at 449, 92 S.Ct. at 1658. Because the questions asked in this deposition were taken verbatim from or closely tracked the transcript of Conboy's grand jury testimony, we believe that his answers at the deposition would be "derived from" the prior immunized and therefore unavailable for use in any subsequent criminal prosecution.

Two other circuits that considered this question have reached the same conclusion. In *In re Corrugated Container Antitrust Litigation, Appeal of Fleischacker,* 644 F.2d 70 (2d Cir. 1980), the deponent, like Conboy, was a former employee of one of the defendants in this case. His earlier testimony before the grand jury was immunized pursuant to 18 U.S.C. § 6002, and the examining counsel confined his questions to those taken verbatim from or closely following the transcript of that testimony. When the deponent refused to answer the questions in spite of a court order compelling him to do so, Judge Singleton held him in contempt.

The Second Circuit, in affirming the contempt order, held that:

where a transcript of a witness' immunized testimony constitutes the source of

questions posed to the same witness in a civil proceeding, responsive answers to such questions are necessarily 'derived from' the immunized testimony, and thus unavailable for subsequent prosecutorial use. Since answers to questions derived from immunized testimony cannot be used against the witness in any criminal proceeding, it follows that, in such cases, the Fifth Amendment privilege against self-incrimination cannot be properly invoked. Therefore, once a court determines that immunized testimony has provided the source of the questions posed, the court may compel the witness to respond without infringing the Fifth Amendment.

*Fleischacker, supra,* 644 F.2d at 77.

*Appeal of Starkey,* 600 F.2d 1043 (8th Cir. 1979) concerned an alleged price-fixing conspiracy in the dairy industry. The deponent appealed from an order holding him in contempt for asserting his Fifth Amendment privilege at a civil deposition. As in the case at bar, the deponent was asked questions taken from the transcript of his previously immunized testimony before a grand jury. The Eighth Circuit held that as long as the questions were restricted to "the same time, geographical and substantive framework as the grand jury testimony," then he could not properly invoke the Fifth Amendment. *Id.* at 1048. The court stated that the deponent "clearly has immunity from criminal prosecution for the [civil] deposition testimony because such testimony would be tainted by the federal grand jury testimony for which [he] received 'use' immunity pursuant to 18 U.S.C. § 6001 *et seq.*" *Id.* at 1046. *Accord, Little Rock School District v. Borden, Inc.,* 632 F.2d 700 (8th Cir. 1980) ("the immunization of their testimony before the : . . grand jury pro-

---

3. 18 U.S.C. § 6002 provides:

 Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

 (1) a court or grand jury of the United States,

 \* \* \* \* \* \*

 and the person presiding over the proceeding communicates to the witness an order issued

under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

tects them from any subsequent prosecution, state or federal, in which direct or indirect use of this testimony is made").

Our holding today is consistent with our opinions in *Patrick v. United States*, 524 F.2d 1109 (7th Cir. 1975) and *In re Folding Carton Antitrust Litigation, Appeal of Brown*, 609 F.2d 867 (7th Cir. 1979). In *Patrick*, the taxpayer challenged a jeopardy assessment that was based on information given by the taxpayer in his immunized testimony before a grand jury. He argued that forcing him to resort to a refund suit to challenge the assessment puts an impermissible burden on his privilege against self-incrimination because in a refund suit he would have the burden of proof and would necessarily have to present incriminating evidence. The court rejected this argument on the ground that "such later testimony would be elicited only because the government could use the grand jury testimony as a basis for the assessment." 524 F.2d at 1120. Therefore, the testimony in the later proceeding could not be used against the taxpayer in any criminal action because it would be "information . . . indirectly derived from" immunized testimony. *Id.*

In *Brown, supra*, we held that "[w]hen a witness can demonstrate any possibility of prosecution which is more than fanciful," then he has the right to invoke his Fifth Amendment privilege.[4] 609 F.2d at 871. We further stated:

To the extent that an assessment of the probability of prosecution is significant in the trial court's evaluation of an asserted privilege, it is more properly accomplished through examination of the more traditional tests, *viz*, statute of limitations, *immunity*, double jeopardy, *short of the existence of one of these indicia of an absolute bar to subsequent prosecution*, a judge's prediction as to the likelihood of a prosecutor filing an indictment is not dispositive in ascertaining the permissible scope of a claim of fifth amendment privilege.

*Id.* at 872 (footnotes omitted). Although the issue in *Brown* differed from the one presented by the case at bar, we recognized then that the question whether the testimony is protected by a grant of immunity should be examined by the court in determining the propriety of the assertion of the privilege.

### III

Conboy contends that Judge Singleton's decision is a "de facto" grant of immunity, and that his ruling confuses the standard for proper invocation of the privilege against self-incrimination with the exclusionary rule that prevents the introduction of evidence against a witness when the district court makes an erroneous ruling on privilege.[5] *See Brown, supra*, 600 F.2d at 872 n.11. We cannot agree with that characterization of the district court's holding.

---

4. Conboy contends that because the federal statute of limitations for conspiracy and certain state statutes of limitations for antitrust violations have not yet run, it is still possible that he could be prosecuted for· the activities about which he testified. Our holding today makes it unnecessary for us to consider that question, although Chief Judge Cummings agrees with Judge Singleton's resolution thereof, but on the ground that any possibility of Conboy's prosecution is "fanciful." *In re Folding Carton Antitrust Litigation, Appeal of R. Harper Brown*, 609 F.2d 867, 871; *see also, e. g., United States v. Apfelbaum*, 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250.

Judge Cummings adds that these plaintiffs are entitled to this testimony because (as the dissent acknowledges) the vagaries of eviden-

tiary rulings might otherwise prevent its admission at the coming trial.

5. The dissenting opinion reasons that our decision today creates a de facto grant of future immunity by determining that the later use of this testimony will be subject to an exclusionary rule. The dissent then quotes from *Ellis v. United States*, 416 F.2d 791, 796 (D.C.Cir.1969). The analysis condemned in *Ellis* and in other contexts is that a witness may be ordered to testify regardless of the propriety of the privilege asserted on the ground that the testimony will be excluded in the future. In the case at bar, however, we have not concluded that regardless of Conboy's claim of privilege, the later testimony must be excluded. Rather, we have concluded that Conboy has no privilege to assert.

It is well established that a court, although it may not grant immunity to a witness, may interpret the scope of a grant of immunity. *Murphy v. Waterfront Commission*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964); *Kastigar, supra,* 406 U.S. at 453, 92 S.Ct. at 1661; *Fleischacker, supra,* 644 F.2d at 78; *Starkey, supra,* 600 F.2d at 1048. In the case at bar, we must determine if Conboy's testimony at the deposition would be immunized in order to rule on the propriety of his assertion of the Fifth Amendment privilege. In holding that his deposition testimony could not be used against him in a subsequent criminal prosecution because it would be derived from his previous immunized testimony, we are merely interpreting the scope of that grant of immunity.[6]

The dissenting opinion, relying on *Kastigar,* reasons that compelling Conboy to testify at the deposition would create a new source of evidence and that the coextensive immunity granted for Conboy's testimony in an earlier proceeding would not protect the deposition testimony because the earlier immunity "protects only the *source,* not the

substance of the information."[7] *Infra* at 19. This statement is followed by a quotation from *Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1661.

The analysis simply ignores the basic issue in this case and any case involving use immunity granted under section 6002—that is, whether the deposition testimony is directly or indirectly derived from the immunized testimony. If so, then the testimony receives the same protection as the earlier testimony. The dissenting opinion fails to deal with this issue of statutory construction and merely states that our holding that the later testimony is directly or indirectly derived from the immunized testimony is conclusory. But the analysis of the dissenting opinion fares no better under its own criticism—it concludes that the later deposition would create an independent source and the immunity protects "substance" and not "source." Unfortunately, this provides little insight into determining when a source is independent or when testimony is directly or indirectly derived from immunized testimony.[8]

---

6. As Conboy notes in his brief, he could be subject to prosecution for perjury if his answers at the deposition are inconsistent with those he gave before the grand jury. This does not, however, compel a different conclusion. It is clear that the district court has the authority to inquire into the basis for a witness's claim of Fifth Amendment privilege. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *Brown, supra,* 609 F.2d at 871 n.5. If Conboy, by answering truthfully any question at the deposition, would be risking prosecution for perjury, he would of course be permitted to invoke the privilege.

7. *United States v. Kuehn,* 562 F.2d 427 (7th Cir. 1977), cited by the dissent, is not to the contrary. In *Kuehn,* we held that a defendant who voluntarily restates the substance of his prior immunized testimony creates an independent source of incriminating evidence that is not protected by the prior grant of immunity. That decision is clearly distinguishable from the instant case in which the court compelled the deponent to testify over his assertion of his Fifth Amendment privilege only as to matters within the scope of his prior immunized testimony.

8. A recurring problem in the analysis adopted by the dissent is a confusion between transactional and use immunity. This is evident where

the dissent, *infra* at 21 n.14, states that the later deposition creates an independent source, and relies on the fact that separate grants of immunity were provided to Conboy for his initial interview and for his grand jury testimony. Two different grants of immunity may have been necessary because the prosecutor wished to ask questions before the grand jury that were beyond the scope of the Justice Department interview.

A simple hypothetical illustrates the distinction that the dissenting opinion apparently overlooks. Assume that two codefendants engaged in criminal activity. One defendant is called before the grand jury and given use immunity. He testifies and is later deposed in a related civil case. Under our ruling today, he may be compelled to testify as to those matters discussed before the grand jury. If his codefendant confesses and decides to testify against him at a later criminal trial, nothing in our ruling would prohibit this prosecution. As long as the evidence obtained from the codefendant is independent of the grand jury testimony, the defendant may be tried and convicted for acts which were the subject of the grand jury testimony. Likewise, Conboy may later be prosecuted if independent evidence is obtained.

The dissenting opinion relies on *Kastigar, supra,* 406 U.S. at 453, 92 S.Ct. at 1661, as support for its "substance not source" analysis, but *Kastigar* does not support the proposition. The quoted passage is merely a discussion of the difference between use and transactional immunity—"The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted." *Id.* This language is fully consistent with our analysis—only testimony directly or indirectly derived from the earlier grand jury testimony is immune. If prosecutors obtained evidence from a source independent of the grand jury testimony, Conboy may still be prosecuted.[9]

For the foregoing reasons, the order of the district court is AFFIRMED.

SPRECHER, Circuit Judge, dissenting. I respectfully dissent.

John A. Conboy is a former executive of the Weyerhaeuser Company. He was one of numerous immunized grand jury witnesses in an investigation leading up to the indictments of fourteen companies and twenty-six individuals for a nationwide conspiracy to fix prices in the corrugated container industry. Relying on a promise of immunity from the Justice Department, Conboy submitted to an interview by Justice Department attorneys who questioned him extensively concerning his participation in and knowledge of alleged price communications and agreements among suppliers in the corrugated container industry. Subsequently, Conboy testified before a grand jury regarding these issues, having received a separate and independent grant of use immunity.

Following the conclusion of the criminal trial, numerous civil actions were brought against the major corrugated container manufacturers, including Weyerhaeuser. These civil cases were consolidated in *In Re Corrugated Container Antitrust Litigation,* MDL 310 (S.D.Tex.). In this litigation, class action plaintiffs either tried or settled their claims. The class trial and many of the class settlements are the subject of pending appeals. Eighteen "opt-out" cases remain pending before the district court. The opt-out plaintiffs allege, among other things, that the defendants were engaged in, and fraudulently concealed, an ongoing price-fixing conspiracy in the corrugated container industry through 1978.

The opt-out plaintiffs subpoenaed several previously immunized grand jury witnesses, including Conboy, for deposition testimony and production of documents. On May 20, 1981, Conboy appeared with counsel in Chicago for deposition pursuant to a subpoena. At his deposition, Conboy initially testified as to the dates and general nature of his employment with Weyerhaeuser. He was then asked: to confirm that he had testified at the Justice Department interview and the grand jury; to identify as "true" and correct" a transcript of his interview and of his grand jury testimony;[1] and whether his responses at the interview and before the grand jury had been true and correct. Conboy refused to answer these and other questions pertaining to his interview and grand

---

**9.** The dissenting opinion discusses the possibility that the deposition testimony may stray from the four corners of the grand jury testimony and that therefore the Government may be prejudiced in any future attempt to prosecute Conboy because all future evidence might be tainted. This speculative prejudice is better solved by a practical solution. If Government prosecutors are concerned about Conboy being "tricked" into discussing other matters, they might come forward and ask to be present at the deposition to protect any interest the Government might have.

**1.** The parties do not dispute that the plaintiffs received copies of the transcripts of the Justice

Department interview and the grand jury testimony. In this appeal, the parties do not state how these transcripts were made available to them. In *In re Corrugated Container Litigation, Appeal of Charles J. Franey,* 620 F.2d 1086 (5th Cir. 1980), involving an appeal from the same multi-district litigation by other witnesses for refusals to answer deposition questions regarding previous grand jury testimony, the transcript had been made available to the plaintiffs by court order, which was appealed. 620 F.2d at 1089 n.2. Here, Conboy does not challenge the provision of transcripts to plaintiffs and we express no opinion as to the propriety of that action.

jury testimony on the basis of the Fifth Amendment privilege against self-incrimination.[2] He did acknowledge that any testimony which he may have provided was given pursuant to prior grants of immunity. Conboy's counsel advised the plaintiffs' counsel that Conboy would invoke his Fifth Amendment privilege in response to all further questions concerning pricing activities during his tenure as Weyerhaeuser's Regional Marketing Coordinator in Worthington, Ohio.

The plaintiffs' counsel then suspended the deposition and telephoned the judge presiding over the multidistrict litigation. The judge was informed of the relevant facts regarding Conboy's employment with Weyerhaeuser and that Ohio had no statute of limitations for antitrust actions.[3] Conboy's counsel argued that, even though the prior testimony had been immunized, new answers to those questions, or even new answers confirming that the previous answers had been made could tend to incriminate Conboy.

The district court judge advised the parties that he was empowered to sit as a district judge in Illinois under 28 U.S.C. § 1407,[4] and began to question Conboy regarding his employment history in Ohio and his knowledge of possible prosecution by Ohio authorities.[5] Based on Conboy's inability to establish the existence of a pending criminal investigation, the court ordered him to answer the specific questions previously asked. Conboy again refused to answer, asserting his Fifth Amendment privilege. The court found him to be in civil contempt pursuant to 28 U.S.C. § 1826, fined him $5,000, and imposed a six-month imprisonment. The court stayed execution of the order pending appeal. Conboy now

---

2. The balance of the deposition consisted of questions previously asked at the Department of Justice interview concerning Conboy's alleged involvement in price fixing activities during his tenure as Regional Marketing Coordinator for Weyerhaeuser's Central Region in Worthington, Ohio. The interrogation fell into the following pattern: a question was asked from the transcript; then it was rephrased to include the transcript answer (i. e., "[i]s it not the fact that . . . ."); finally, Conboy would be asked if he had "so testified" in his interview statement. Examples of this three-question pattern are as follows:

Q: Who did you have price communications with at Alton Box Board?
Q: Is it not the fact that you had price communications with Fred Renshaw and Dick Hermans . . . at Alton Box Board?
. . . .
Q: Did you not so testify in your government interview statement of January 10, 1978? Tr., 20, 20–21, 22.
Q: Would your prices be at or above his prices, referring to Alton's prices?
Q: Is it not the fact that you would price slightly above or slightly below the Alton prices?
. . . .
Q: And did you not so testify in your government interview statement? Tr., 31, 32.

3. Ohio's criminal antitrust statute states in pertinent part:

No Statute of Limitation shall prevent or be a bar to any suit or proceeding for any violation of Sections 1331.01 to 1331.14, inclusive, of the Revised Code.
Ohio Rev.Code Ann. § 1331.12. The constitutionality of this statute has been upheld in *Ohio ex rel. Brown v. Klosterman French Baking Co.*, 1977–1 Trade Cases (CCH) ¶ 61361 (S.D. Ohio, 1976).

4. 28 U.S.C. § 1407(b) provides, in pertinent part, that, in multidistrict litigation, judges to whom pretrial proceedings are assigned "may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions . . . ." See *In re Corrugated Container Antitrust Litigation, Appeal of Phillip L. Fleischacker*, 644 F.2d 70, 76 n.6 (3d Cir. 1980).

5. This interrogation concluded with the following:

Q: Now, has anyone from the Attorney General's Office in Ohio contacted you relating to your work
A: No.
Q: Prior to December 31, 1975?
A: No, sir.
Q: Are you a party to any lawsuit involving that work?
A: I am not.
Q: Have you been called as a witness—other than in this case—in any case arising out of Ohio?
A: No, Your Honor, I haven't.
Q: Related to the corrugated industry and your work in that industry?
A: No, sir.
Tr., 51–52.

appeals to this Court pursuant to 28 U.S.C. § 1826.[6]

## II

There are two major issues in this appeal. The first is whether Conboy faces any risk of prosecution.[7] The second is, even if there is a risk of prosecution, whether a court can deny the protection of the Fifth Amendment if it concludes that the answers to the questions asked will be so "tainted" by previous grants of immunity that those answers will be inadmissible in subsequent criminal proceedings. Before reaching these two specific issues, however, it is important to examine the proper scope of interpretation of the Fifth Amendment's protection against self-incrimination.

The Fifth Amendment to our Constitution states that "[n]o person shall ... be compelled in any criminal case to be a witness against himself." U.S.Const. Amend. V. The plaintiffs argue that the testimonial privileges of the Fifth Amendment must be narrowly construed. Relying on *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972), the plaintiffs argue that "the public is entitled to every man's evidence." Pl. Br. at 6. First, *Branzburg* is inapposite, as it held that the First Amendment created no "reporter's privilege" not available to other citizens. Second, plaintiffs failed to complete the quoted sentence in *Branzburg*. The Court carefully acknowledged limitations on the right to evidence, stating, "the longstanding principle that 'the public ... has a right to

every man's evidence,' *except for those persons protected by a constitutional, common-law, or statutory privilege*, ... is particularly applicable to grand jury proceedings." (emphasis added) (citations and footnote omitted). Indeed, the *Branzburg* Court added, to further emphasize that it in no way envisioned any narrowing of the Fifth Amendment:

> Until now the only testimonial privilege for unofficial witnesses that is rooted in the federal constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.

408 U.S. at 689–90, 92 S.Ct. at 2660–2661 (footnote omitted).

The plaintiffs also rely on *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) as supporting their contention that a constitutional protection should be narrowly interpreted when balanced against a private litigant's evidentiary need. But the plaintiffs' reliance on *Nixon* is also misplaced. The *Nixon* Court emphasized that the issue before it did not involve balancing a *specific* constitutional privilege against the need for evidence in *civil* litigation.[8] The Court's care in expressing what it was *not* considering suggests that even an evidentiary privilege not specifically stated in the Constitution, such as that asserted by President Nixon, should

---

**6.** 28 U.S.C. § 1826(b) provides, in pertinent part, that "[a]ny appeal from an order of confinement under this section [recalcitrant witnesses] shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal." Conboy's appeal was docketed with this Court on June 17, 1981. The parties completed their submission of briefs to this Court on July 10, 1981.

**7.** A preliminary question is whether answers to the questions in issue might tend to reveal that the witness was engaged in criminal activity. *In re Corrugated Container Antitrust Litigation, Appeal of Charles J. Franey*, 620 F.2d 1086, 1091 (5th Cir. 1980). Here, there is no serious dispute that Conboy's answers might tend to reveal that he was engaged in criminal activity.

**8.** The *Nixon* Court stated:

> We are not here concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation, nor with the balance between the confidentiality interest and congressional demands for information, nor with the President's interest in preserving state secrets. We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.

418 U.S. at 712 n.19, 94 S.Ct. at 3109 n.19.

be given a high degree of deference. *Nixon* in no way derogates the fundamental primacy of constitutional principles.

The Fifth Amendment privilege against self-incrimination is one of the core concepts of our adversary judicial system. The privilege is a shield against the dangers of an inquisitorial system of jurisprudence. As Justice Blatchford stated in *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110 (1892), the Fifth Amendment privilege "must have a broad construction in favor of the right which it was intended to secure." The passage of time since *Counselman* has not seen any diminution in the Court's constant vigilance against the narrowing of this fundamental constitutional protection.

In view of the high place that the Fifth Amendment privilege occupies, both in our Constitution and in our judicial system, and in view of the strong traditional respect for each individual's rights that undergirds the privilege, the Court "has always broadly construed its protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action." *Maness v. Meyers*, 419 U.S. 449, 462, 95 S.Ct. 584, 593, 42 L.Ed.2d 574 (1975) (citations omitted). As the Court stated in *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972):

> But the power to compel testimony is not absolute. There are a number of exceptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty .... This Court has been zealous to safeguard the values that underlie the privilege.

(footnotes omitted). *See Murphy v. Waterfront Comm'n.*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964) ("The Fifth Amendment privilege reflects many of our fundamental values and most noble aspirations ...."); *Ullman v. United States*, 350 U.S. 422, 426, 426–29, 76 S.Ct. 497, 500, 500–501, 100 L.Ed. 511 (1956) ("Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit.") (Frankfurter, J.); *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (privilege must be accorded liberal construction); and *Arndstein v. McCarthy*, 254 U.S. 71, 72–73, 41 S.Ct. 26, 65 L.Ed. 138 (1920) (privilege must be accorded broad construction).

### III

Cognizant of the need for a liberal construction of the fundamental Fifth Amendment privilege against self incrimination, we now consider whether Conboy faced any risk of prosecution. The district court concluded, first, that Conboy could not face federal charges because the applicable five-year statute of limitations had run. Second, the district court seemed to conclude that Conboy would not face any charges in Ohio because Conboy admitted he did not know of any litigation related to the corrugated industry in the state of Ohio.[9] But the court's reasoning is erroneous for several reasons.

---

9. The district court's order provided, in part, as follows:

> The federal statute of limitations is four [sic] years which indicates that Mr. Conboy would not be subject to federal prosecution for the period before December 31, 1975. Counsel for John A. Conboy stated that Mr. Conboy may be subject to prosecution in Ohio where there exists no applicable statute of limitations for antitrust violation. The Court questioned Mr. Conboy as to whether he knew of any pending litigation related to the corrugated industry in the state of Ohio. Mr. Conboy answered that he has not been contacted to testify nor does he know of any such litigation in Ohio. Counsel for John A. Conboy did not present proof that any other applicable statute of limitations had not run. *In re Corrugated Container Antitrust Litigation, Order Adjudging John A. Conboy To Be In Civil Contempt of Court*, MDL 310, 2 (S.D.Tex. May 20, 1981).

## A

First, and most fundamental, as this court recently held, the protection of Fifth Amendment applies so long as there is a *possibility* of prosecution, regardless of a judge's assessment of the likelihood of prosecution. *In re Folding Carton Antitrust Litigation, Appeal of R. Harper Brown*, 609 F.2d 867 (7th Cir. 1979). I reiterate the importance of our holding in *Brown* :

> Short of the existence of one of these indicia [*viz.*, statute of limitations, immunity, double jeopardy] of an *absolute bar* to subsequent prosecution, a judge's prediction as to the likelihood of a prosecutor filing an indictment is not dispositive in ascertaining the permissible scope of a claim of Fifth Amendment privilege.

609 F.2d at 872 (footnotes omitted) (emphasis added).

This court's decision in *Brown* was relied upon by the Fifth Circuit Court of Appeals in an appeal from the same multi-district litigation on the identical substantive issue as the present case. *In re Corrugated Container Antitrust Litigation, Appeal of Charles J. Franey*, 620 F.2d 1086 (5th Cir. 1980). In *Franey*, three deposition witnesses sought review of contempt citations entered against them by the district court when they asserted their Fifth Amendment privilege in civil depositions to questions that were contained in the transcript of their prior immunized grand jury testimony. The Fifth Circuit sustained the witnesses' assertion of the Fifth Amendment privilege, because the risk that they would be prosecuted was "more than fanciful." 620 F.2d at 1092, *quoting Brown*, 609 F.2d at 871. *See In re Master Key Litigation*, 507 F.2d 292, 293 (9th Cir. 1974) (witness justified in refusing to answer unless the only danger is imaginary); *United States v. Johnson*, 488 F.2d 1206, 1209 n.2 (1st Cir. 1973) ("neither the practical unlikelihood of

further prosecution, nor the Assistant United States Attorney's denial of an intention to charge conspiracy, negated [the defendant's] privilege"); and *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958) (no justification for limiting the Fifth Amendment privilege whenever it appears the government would not undertake to prosecute).

The "absolute bar" test recognizes that, to the extent any doubt exists regarding the validity of the claimed Fifth Amendment privilege, the benefit of that doubt must go to the witness asserting the privilege. The determination whether to prosecute is exclusively within prosecutorial discretion. The validity of the privilege cannot be grounded on a district court's prediction of the likelihood of prosecution because of the past and present behavior of prosecutorial authorities is not a sufficiently accurate indication of the risk of criminal prosecution. *See Miranti*, 253 F.2d at 139.[10]

Not only must the benefit of the doubt go to the witness claiming Fifth Amendment privilege, but also the burden of proof as to any prosecution must not be improperly shifted to the witness. As the Court stated in *Hoffman*, the witness must not be required to prove the possibility of prosecution "in the sense in which a claim is usually required to be established in court." 341 U.S. at 486. Here, the trial court seemed to base its contempt order, in part, on Conboy's failure to prove the existence of an impending criminal prosecution against him. *See* note 9, *supra*. This basis for the contempt order is clearly incorrect. So long as there is any basis for a prosecution, the Fifth Amendment protection applies.

## B

The district court erred in concluding that Conboy could not face federal charges

---

**10.** The *Miranti* court stated:

> We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would

require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminating answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor. 253 F.2d at 139 (footnotes omitted).

for his activities prior to December 31, 1975. Although the statutes of limitations have run for the antitrust charges, the plaintiffs admit that the federal statute of limitations for conspiracy does not begin to run until a defendant's last act in furtherance of the conspiracy. Unless an individual can show withdrawal from the conspiracy by an affirmative act designed to defeat the purpose of the conspiracy, that defendant remains liable for all acts committed by co-conspirators until the conclusion of the conspiracy. *See United States v. Fitzgerald*, 579 F.2d 1014 (7th Cir.) *cert. denied*, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978) (prosecution of defendants not barred by statute of limitations even though they ceased active participation in the conspiracy seven years before the indictment).

The plaintiffs argue that Conboy is not "really" subject to federal prosecution because a Justice Department attorney, in a letter to another defendant in the corrugated container civil litigation stated that the Justice Department had no intention to prosecute any previously immunized witness in the corrugated container litigation. But this is a slender reed indeed on which to strip the fundamental constitutional protection afforded by the Fifth Amendment privilege. Plaintiffs cite no law stating that the Justice Department letter is binding on the Justice Department. *See Miranti*, 253 F.2d at 139, quoted at note 10 *supra*. The key point, which plaintiffs concede, is that notwithstanding the Justice Department letter, Conboy *does* remain liable to subsequent federal prosecution.

Even if we assume—and I do not—that the Justice Department is somehow bound by a letter of one of its attorneys, it is undisputed that Conboy is subject to state antitrust charges in Ohio. Plaintiffs suggest, however, that the possibility of such prosecution is "fanciful", and that Conboy could successfully plead laches as a defense.

Plaintiffs' counsel ask us to determine, as a matter of law, that the possibility if an Ohio action against Conboy is fanciful merely because, to date, Ohio has not instituted any action of the corrugated container industry of which plaintiffs counsel are aware. But Fifth Amendment protections should not be eviscerated merely on plaintiffs' counsels' assurances that they do not happen to know of any Ohio investigation of the corrugated container industry. Indeed, the lack of foundation for such assurances is seen in the admission of one of plaintiffs' counsel, at oral argument before this Court, that he did not know that, as indicated in *Franey*, 620 F.2d at 1092, a federal grand jury sitting in Ohio had begun its own investigation of the corrugated container industry. If counsel did not know of this federal grand jury, they very well might not also know of a state grand jury, should one be sitting.[11] This example demonstrates that constitutional protections should not be based on adversaries', or even on witnesses', knowledge of potential prosecutorial activities.

Plaintiffs respond by arguing that, even if Conboy should be prosecuted in Ohio, he would be able to invoke laches as a complete defense. For this unusual assertion, they rely on *Ohio ex rel. Brown v. Flosterman French Bakery Co.*, 1977–1 Trade Cases (CCH) ¶ 61,361 (S.D.Ohio 1976). First, as will be discussed, whether or not Conboy may utilize certain defenses in a

11. In a letter after oral argument, plaintiffs' counsel stated:

In the course of the oral argument in the case of *In Re Corrugated Container Antitrust Litigation, Appeal of John Conboy*, there was a question concerning whether a federal grand jury was impaneled in Ohio to investigate the corrugated container industry. As I expressed to the Panel, it was my understanding that no such investigation was under way. To make certain that my representations to the Court were correct, Mr. Polster of the Justice Department, Antitrust Division, Cleveland Branch, was contacted concerning this matter. Mr. Polster confirmed the accuracy of my representation to this Court by stating that he was aware of no such grand jury investigation pending at this time. Moreover, Mr. McShane of the Ohio Attorney General Office, Antitrust Division, has stated that his office has no knowledge of any Ohio antitrust criminal investigation into the corrugated container industry.

subsequent criminal prosecution has no bearing on the legitimacy of his Fifth Amendment claim in the proceeding at issue. Second, *Klosterman,* a civil decision by a federal, not an Ohio, court in ruling on a motion for summary judgment specifically stated that it was not "ruling upon the applicability of the doctrine of laches in the context of this lawsuit." ¶ 61,361 at 71,274. Moreover, the *Klosterman* discussion of laches was based upon a quotation from *Gardner v. Panama R. R. Co.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951), which stated that laches was a question primarily addressed to the discretion of the trial court. Indeed, the *Gardner* Court held that laches was *not* a defense to the *civil* suit there in issue. Plaintiffs present no Ohio nor any other authority establishing that laches would necessarily be a successful defense to an Ohio prosecution of Conboy.[12]

Even given the possibility of a speculative laches defense, there is no dispute that Conboy remains subject to prosecution in Ohio. But plaintiffs argue that demonstrating this liability somehow "proves too much" because in Ohio antitrust actions are not subject to a statute of limitations. Ohio Rev.Code Ann. § 1331.12. I do not see how this long-term liability "proves too much." As I have discussed, the Fifth Amendment stands between a defendant and *any* possible prosecution. If the prosecution may be threatened over a long time, surely it does not "prove too much" to conclude that the Fifth Amendment protection must also exist for a long time. Otherwise, prosecutors could defeat the Fifth Amendment's protection by waiting to bring actions. Thus, the "proves too much" argument must fall.

In summary, despite the assurances of the plaintiffs to the contrary, Conboy might be prosecuted by both federal and state authorities. As we stated in *Brown,* so long as there is *any* possibility of prosecution, the Fifth Amendment privilege must apply. Whether Conboy actually would be prosecuted, we cannot predict and, therefore, is irrelevant. Any doubt as to the likelihood of possible prosecution must be resolved in favor of the witness.

## IV

The next major question is whether a court can deny the protection of the Fifth Amendment privilege if it concludes that the answers to the questions asked will be so "tainted" by previous grants of immunity that those answers will be inadmissible in subsequent criminal proceedings. It is undisputed that, because his statements were made under grants of immunity, the transcripts of Conboy's Justice Department interview and grand jury testimony could not be used against him. But now, we must consider whether *new* answers to questions based on the earlier immunized testimony are, as a matter of law, *necessarily* themselves immunized.

There is a conflict opinion among the circuits on this question. In *Franey,* the Fifth Circuit held that answers to verbatim questions from prior immunized testimony were not protected by the original immunity grant. But in *In re Corrugated Container Antitrust Litigation, Appeal of Phillip Fleischacker,* 644 F.2d 70 (2d Cir. 1981), and in *In re Order of Civil Contempt, Appeal of Carlos Lee Starkey,* 600 F.2d 1043 (8th Cir. 1979), the Second and the Eighth Circuits held that such answers were protected.

---

**12.** Plaintiffs suggest that Ohio Rev.Code § 1331.13 would prevent a prosecution of Conboy. Ohio Rev.Code § 1331.13 provides, in pertinent part, as follows:

If a court of record . . . in which is pending a civil or criminal action . . . so orders, no person shall be excused from attending, testifying, or producing books . . . or other documents . . . for the reason that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty. No person may be prosecuted or subjected to

a penalty for or on account of a transaction, matter, or thing concerning which he may so testify or produce evidence, documentary or otherwise, before such court, person, or officer.

This statute merely prohibits later prosecution of a witness required to testify *for the required testimony* in the same proceeding. Here, Conboy's testimony would not be ordered under the Ohio statute and, therefore, this statute would not prevent his prosecution.

In my opinion, the better reasoning is found in the *Franey* decision. Also, for other reasons, I conclude that the district court's conclusion that Conboy's testimony could never be used against him in subsequent proceedings was erroneous.

## A

It is important to distinguish, at the outset of this discussion, two different concepts. The first is the court's remedial power to exclude evidence which violates the Fifth Amendment. The second is the scope of the protection afforded by a grant of statutory immunity—aside from any later effort to remedy a violation of the privilege. The basic error committed by the district court is that it confused, and lumped together, these two concepts.

This complex issue requires precise analysis. The district court concluded that Conboy's previously granted use immunity would continue to protect him if, at a later date and in a totally separate proceeding, he repeated his deposition testimony. But this reasoning, apparently based on language in *Starkey*, 600 F.2d at 1047 (possibility of later exclusion of testimony repeating earlier, immunized testimony is all the protection afforded by 18 U.S.C. § 6001), *citing Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972), is conclusory and erroneous. The district

court, and the *Starkey* court, misunderstood *Kastigar* and its precursors. This confusion can be seen by examining the nature of the concept termed "immunity".

There is no question that the Fifth Amendment privilege against self-incrimination may be asserted in a civil proceeding, at discovery or trial, whether the person to be called is a party or a witness. In certain situations, however, the privilege can be supplanted by a statutory grant of use immunity, under 18 U.S.C. § 6001 et seq., which affords protection against self-incrimination *coextensive* with the Fifth Amendment privilege. *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. As the Court emphasized, this coextensive protection protects only the *source*, not the *substance* of the information.[13] *Kastigar* thus teaches that a grant of use immunity for a witness in one proceeding affords *no* protection for any self-incriminating information disclosed by the witness in other proceedings, prior to subsequent to the immunized proceeding.

Use immunity does not even shield a witness from prosecution based on the very facts and activities testified to under the grant of immunity. *See United States v. Kuehn*, 562 F.2d 427, 430, 432 (7th Cir. 1977) (defendant created independent evidence when he repeated previously immunized grand jury testimony to a reporter; court also suggested that the defendant had cre-

---

**13.** The *Kastigar* Court stated:

The statute's [18 U.S.C. § 6002] explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore, is sufficient to compel testimony over a claim of the privilege. *While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader.* Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. *The privilege has never been construed to mean that one who*

*invokes it cannot subsequently be prosecuted.*

406 U.S. at 453, 92 S.Ct. at 1661 (emphasis added). Later in the opinion, the Court again emphasized the limits of statutory use immunity:

The statute, like the Fifth Amendment, grants neither pardon nor amnesty. *Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.*

. . . .

We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it.

406 U.S. at 461–62, 92 S.Ct. at 1665 (emphasis added)

ated independent testimony by repeating his immunized testimony as a witness in another trial) (Swygert, J.); *United States v. First Western State Bank of Minot*, 491 F.2d 780, 786 (8th Cir.), *cert. denied sub nom. Thompson v. United States*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974) ("The federal government, however, can use the same evidence testified to by defendants before the grand jury if it can demonstrate that the evidence to be used against defendants came from a legitimate source wholly independent of the compelled testimonies."); and *Miranti*, 253 F.2d at 138 (witnesses' refusal, on self-incrimination grounds, to verify before grand jury statements made before a previous grand jury upheld because such verification could have been used as evidence against defendants).

As the above cases teach, and as is stated in *Comment, Requiring Witnesses to Repeat Themselves*, 47 Tex.L.Rev. 266, 267 (1969), repetition of testimony in an independent proceeding may itself be viewed as incriminating. Thus, Conboy's deposition, even if it merely repeated or acknowledged his earlier testimony could constitute an independent source of evidence against him.[14]

But the district court reasoned in a brief statement, that because Conboy testified earlier under immunity, he "cannot" be prosecuted for subsequent testimony based on the earlier testimony. The court, presumably relying on *Fleischacker* and *Starkey*, apparently concluded that the new deposition testimony would be inherently "tainted" by the previous grant of immunity and would thus, necessarily be inadmissable in any subsequent criminal proceeding.

## B

The initial problem with the *Fleischacker* theory, that subsequent verification of previously immunized testimony is necessarily tainted is that this theory focuses on the derivation of the deposition questions (derived from immunized testimony) rather on the deposition answers (answered "now"). The answers, unlike the questions, are not "directly or indirectly derived" from the immunized grand jury or interview transcripts. Rather the answers are derived from the deponent's *current*, independent memory of events.

The misunderstanding of the nature of the answers leads to the next error in the *Fleischacker* theory, a misunderstanding of use immunity, such as given to Conboy. Both direct and indirect "use" of immunized testimony is prohibited. Direct use of previously immunized testimony would be exemplified by the introduction of that specific testimony in a subsequent proceeding. Indirect use would occur when a prosecutor has access to or is otherwise influenced by the immunized testimony and cannot prove, in a later criminal proceeding, that the evidence was derived without the aid of the immunized testimony. But neither of these concepts applies to the potential situation before us. If Conboy answers the proposed questions, those answers necessarily create a *new* source of evidence. The new answers could then be used by a prosecutor because those specific answers were not derived from the previously immunized testimony—even though the questions, of course, were so derived.[15]

14. This conclusion is buttressed by the government's policy of seeking specific grants of immunity with respect to each proceeding at which a witness testifies. *See In re Folding Carton Antitrust Litigation*, 465 F.Supp. 618, 626 (N.D.Ill.), *rev'd. on other grounds*, 609 F.2d 867 (7th Cir. 1979). This policy was evidenced by the separate and distinct grants of immunity provided to Conboy for his initial interview testimony and then for his grand jury testimony.

15. Other general considerations also mandate the conclusion that deposition testimony is in-

dependent evidence. A civil action is clearly a proceeding which is separate and distinct from a grand jury investigation or subsequent criminal trial. Because civil discovery constitutes an independent stage of litigation, testimony given in discovery would be deemed an independent source of evidence. Thus, for example, one who has freely given non-immunized grand jury testimony may nonetheless assert the Fifth Amendment privilege in subsequent proceedings. *See, e. g., United States v. Cain*, 544 F.2d 1113, 1115 (1st Cir. 1976) (Justice Clark, sitting by designation); *United States v. Johnson*, 488 F.2d 1206, 1208 (1st Cir. 1973)

## C

Another major problem with the *Fleischacker* theory that subsequent testimony based on questions from previously immunized testimony is that this theory results in improper de facto grants of immunity by courts. As the *Franey* court stated, "even if the court's finding that the witness' testimony would be 'derived' from immunized testimony were manifestly wrong, the court's order compelling the testimony would operate to immunize the testimony because of 'the well-established [exclusionary] rule . . . .' " 620 F.2d at 1093.

In a curious footnote, the *Fleischacker* court conceded the very real danger of de facto immunity. That court acknowledged that the exclusionary rule does indeed result in de facto immunity; emphasized that the exclusionary rule was solely remedial and thus could not be used to justify a denial of the Fifth Amendment's protection; and then stated that conferral of de facto immunity was unauthorized. 644 F.2d at 78 n.13.[16] But the *Fleischacker* court reasoned that no de facto immunity would occur because it was convinced that the *answers* to a subsequent deposition would necessarily "derive from" the previous immunized testimony.

First, it does *not* follow that answers to subsequent testimony are necessarily "derived from" previously immunized testimony. Second, the *Fleischacker* reasoning bootstraps the critical question in issue. It assumes there will be no de facto grant of immunity because its analysis is "correct".

But the critical feature of de facto immunity is that it occurs even when a court's analysis is "correct". If a court incorrectly determines that subsequent testimony was immunized, then it can and should remedy the error—i. e., the violation of the witness' Fifth Amendment privilege—through the exclusionary rule. But the key point is that, regardless of the correctness of the decision, as even the *Fleischacker* court seemed to admit in its footnote, that the reliance on such a later remedy *necessarily* involves prospective grant of improper de facto immunity.

The impropriety of such immunity is clearly explained by the court in *Ellis v. United States*, 416 F.2d 791, 796 (D.D.C. 1969):

A trial judge cannot reject a witness's claim of privilege merely on the ground that the ruling cannot hurt the witness because it will establish an immunity from subsequent prosecution.

We are not here concerned with a case where a judge has made a mistake in applying legal rules, like a case where he erroneously rules that a witness has waived his privilege. In the case before us, the judge did not purport to deny that the witness had correctly presented a claim of privilege. He merely asserted that the witness would nevertheless be protected, by *Murphy*, against prosecution based on his testimony.

The ruling was made by an able and conscientious trial judge. We are confident it was made in good faith, and can

---

citing 8 *Wigmore on Evidence* § 2276, 470–72 (McNaughton rev. 1961; Supp. 1972).

16. The *Fleischacker* Court's discussion of this issue is as follows:

Immunity is a creature of statute and as such can be conferred only in a manner consistent with its legislative design. . . . Section 6003 empowers the executive branch of the government to confer immunity upon a witness to compel testimony over an assertion of privilege; courts cannot confer immunity upon a witness on their own initiative. . . . *The discretion is placed in the executive branch, not in the judiciary.* . . . Nevertheless, where a "district court errs in making a ruling on privilege an after-the-fact

exclusionary rule will apply to prevent the introduction of that evidence against the witness." . . . *Thus, the operation of the exclusionary rule results in a de facto grant of immunity.* But [sic] *"this exclusionary rule is solely remedial and cannot be used as a rationale to support a judicial decision which contravenes the fifth amendment's protection."* . . . Though the protection afforded a witness by *de facto* immunity grants necessarily must be coextensive with grants of immunity obtained under the immunity statute, conferral of *de facto* immunity is nevertheless unauthorized.

644 F.2d at 78 n.13 (emphasis added) (citations omitted).

even discern how the judge may have come to a mis-reading of *Murphy*. *Nevertheless, his ruling was in the nature of a circular, self-fulfilling prophecy that in substance can only be viewed as a grant of immunity. That ruling was outside the scope of judicial authority.* (emphasis added). *See In re Folding Carton Antitrust Litigation,* 465 F.Supp. 618, 628 (N.D.Ill.1979), *rev'd on other grounds, Brown,* 609 F.2d 867. In denying Conboy's Fifth Amendment claims the district court made a prospective determination that Conboy's future deposition testimony would necessarily be tainted, and thus compelled his deposition testimony. This is precisely what a court cannot do. *Brown,* 609 F.2d at 872 n.11; *Ellis,* 416 F.2d at 796; *In re Folding Carton Antitrust Litigation,* 465 F.Supp. at 628.

To let stand the district court's order regarding Conboy's Fifth Amendment claims would improperly extend the power of the judiciary beyond its intended scope. The immunity statute specifically restricts the authority to initiate an immunity order to U. S. Attorneys, with the approval of the Attorney General. 18 U.S.C. § 6003. A court has no power to issue immunity sua sponte; the power to grant immunity lies only with the Executive. *Ryan v. Commissioner,* 568 F.2d 531, 540 (7th Cir. 1978); *In re Daley,* 549 F.2d 469, 479 (7th Cir. 1977).

The district court, by compelling Conboy's deposition, has improperly expanded the narrow *use* immunity previously afforded by the government with regard to *criminal* proceedings into an order by which *civil* plaintiffs obtain testimony for their use in a totally different judicial proceeding. Compelling Conboy's testimony here would result in conferring upon private civil litigants the power to effect a grant of broad

*transactional* immunity by intentionally violating a witness' Fifth Amendment rights.[17]

**D**

The foregoing problems in the *Fleischacker* immunity theory lead inexorably to the next, and perhaps most fundamental, flaw in that theory. The district court, in compelling Conboy's deposition testimony, is predicting that in a future criminal prosecution of Conboy, another court will agree with the district court's determination that the deposition testimony should be excluded. But, as we recognized in *Brown,* the exclusionary rule is remedial and cannot be used as a rationale to support a judicial decision which contravenes the Fifth Amendment's protection. 609 F.2d at 872 n.11.

No government prosecutor is a party to this litigation. There is no guarantee that, in a subsequent prosecution of Conboy, another court will agree with the district court's reasoning. It is simply not possible to assume that no subsequent court could *ever* admit the deposition testimony.

In summary, the district court's order places Conboy on the horns of the following dilemma. Either all courts must be bound by the determination that Conboy's deposition is tainted, or future courts are not bound by that determination. If all courts are bound, then the district court has improperly transformed statutory use immunity into de facto judicial transactional immunity. If future courts are not bound, Conboy's Fifth Amendment rights have not been supplanted with "coextensive" protection, as required by *Kastigar.* Rather, his Fifth Amendment rights will have been stripped away based on a tenuous prediction of future events. Constitutional rights

---

**17.** As the district court stated in *Folding Carton Litigation,* 465 F.Supp. at 629, *rev'd on other grounds, Brown,* 609 F.2d 867:

> Such an expansion of the witnesses' immunity would come at the plaintiffs' request, not the government's. Plaintiffs would essentially be in the position of granting immunity which *is* a result inconsistent with Congress' antitrust policy ... and with congressional policy limiting the power to authorize grants

of immunity to the Executive Branch.... Under circumstances where the witnesses have "a reasonable fear of prosecution," compelling the deposition testimony of these five witnesses would essentially constitute an impermissible transformation of the limited "use" immunity grant envisioned under § 6002 into a "transactional" immunity grant....

(citations omitted).

are too vital to be sacrificed to such predictions.

## V

In addition to the two broad issues of this case, whether Conboy faces any risk of prosecution and whether his deposition testimony is necessarily tainted, there are serious practical problems with ordering Conboy's deposition. First, if Conboy's answers at his deposition are even inconsistent with his earlier answers during the preliminary interview or at the grand jury interview, he could be subject to prosecution for perjury or giving false statements even without a specification in the indictment as to which answer is false. *See* 18 U.S.C. § 1623(c).

Recently, the Supreme Court has ruled that perjury prosecutions based on immunized testimony are permissible and that all statements made during the giving of immunized testimony, both true and false, may be admitted in the course of a subsequent perjury action if such use was not otherwise prohibited by the Fifth Amendment. *United States v. Apfelbaum*, 445 U.S. 115, 123, 100 S.Ct. 948, 953, 63 L.Ed.2d 250 (1980). Similarly, in *United States v. Housand*, 550 F.2d 818 (2d Cir. 1977), held that a witness, in precisely the situation confronting Conboy here, could claim his Fifth Amendment privilege and refuse to testify a second time on matters about which he has previously given immunized testimony, since an inconsistency might give rise to a perjury or false statements prosecution.[18]

Second, Conboy faces a serious problem of waiver. He and his counsel will have the heavy burden of ensuring that he does not stray even an inch beyond the four corners of the earlier transcripts. I realize that he and his counsel will have the transcripts before them, but emphasize that the burden of monitoring past and present testimony will be unduly onerous. For the slightest

misstep—and questions may be strategically designed to induce such a misstep—could be fatal.

Moreover, it is well established that "[d]isclosure of a fact waives the privilege as to details." *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951). For example, in earlier testimony, Conboy may only have testified *that* certain price communications occurred. If he repeats this testimony in the civil deposition, he may be found, by another court, to have waived his Fifth Amendment privilege as to *details* of those communications to which he had not earlier testified. Such details may, in turn, provide investigative leads to incriminating matters totally untouched in the earlier testimony. Thus, Conboy faces very real waiver problems.

## VI

Finally, the district court order compelling Conboy's testimony may be unnecessary in any event inasmuch as Conboy's grand jury testimony would in most likelihood become admissible as the result of Conboy's assertion of his privilege against self-incrimination. Rule 804 of the Federal Rules of Evidence permits former testimony to be introduced if the "declarant is unavailable as a witness" and if the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

First, a witness who asserts his privilege against self-incrimination "is unavailable." *United States v. Zurosky*, 614 F.2d 779, 792 (1st Cir. 1979); *United States v. Toney*, 599 F.2d 787, 789–90 (6th Cir. 1979); *Witham v. Mabry*, 596 F.2d 293, 297 (8th Cir. 1979); *United States v. Lang*, 589 F.2d 92, 95 (2d Cir. 1978).

Second, Conboy asserts and the plaintiffs do not deny, that at least some of the parties against whom the earlier testimony

---

**18.** The *Housand* court stated:

The Fifth Amendment privilege question arises when the witness refuses to answer on the ground that his *second* version of the event may result in his prosecution for perjury .... [T]he giving of truthful [but inconsistent] testimony on the second occasion could surely trigger investigation of whether the original testimony was false .... This is a reasonable cause for apprehension and supports the claim of privilege.
550 F.2d at 823.

could be offered have had the opportunity to develop the immunized testimony by cross-examination in the prior criminal proceeding. It may be, however, that the "opportunity for cross-examination" aspect of Fed.R.Evid. 804(a) is inapplicable. For Conboy's Fifth Amendment privilege may have prevented any opportunity for cross-examination.

The "opportunity for cross-examination" objection may not resolve this situation because it is too broad. Plaintiffs have stated that they do not intend to ask any questions beyond those asked in the earlier transcripts. It is undisputed that Conboy has, and will exercise, his Fifth Amendment privilege to answer any such questions. Defendants will not, therefore, have any real opportunity to cross-examine at the deposition. In practical terms, there is no difference between a lack of opportunity for cross-examination at the grand jury and before the Justice Department and the lack of opportunity for cross-examination at a new deposition. Thus, if the "opportunity for a cross-examination" objection would preclude admission of the prior depositions, it would also preclude admission of the new deposition.

Although it is conceivable that the district court might not admit Conboy's grand jury testimony for some reason, in my view this risk is preferable to taking the risk that Conboy will never be prosecuted when there exists the possibility that he will be prosecuted.

## VII

The critical question in this case is whether the fundamental Fifth Amendment protection against self-incrimination should be sacrificed to the plaintiffs' need for evidence in their civil litigation. The answer is that a plaintiff is only entitled to that evidence which is not otherwise protected. *Branzburg*, 408 U.S. at 688, 92 S.Ct. at 2660.

Recently, in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), the Court reaffirmed the fundamental primacy of the Fifth Amendment. In *Portash*, the Court held that the Fifth Amendment prohibits the use of a witness'

immunized grand jury testimony to impeach the trial testimony of that witness. Surely, if the interests of securing justice free of the taint of perjured testimony in a criminal trial are overridden by the dictates of the Fifth Amendment, the mere denial of certain discovery to civil plaintiffs, especially when the same testimony has been secured previously, should hardly allow any curtailment of the privilege against self-incrimination. Any inconvenience to the plaintiffs must pale in the face of denial of the fundamental right against self-incrimination.

In sum, we are asked to rely on too many uncertainties. Plaintiffs assure us that Conboy will not be prosecuted. But Conboy might be prosecuted. Plaintiffs assure us that the deposition testimony could never be used against Conboy. But that testimony might be used against him. And when he does testify, he might face the possibility of perjury or waiver.

In the face of these uncertainties, we should not conclude that Conboy's Fifth Amendment protections do not apply. I would reverse.